1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10  BRUCE PHAN,

11          Petitioner,               2: 09 - cv - 2040 - GEB TJB

12      vs.

13  JOHN W. HAVILAND, Warden

14          Respondent.          ORDER, AMENDED FINDINGS AND

15                               RECOMMENDATIONS

16  _____/

17                     I.  INTRODUCTION

18          Petitioner, Bruce Phan, is a state prisoner and is proceeding through counsel with a writ

19  of habeas corpus pursuant to 28 U.S.C. § 2254.  After a jury trial, Petitioner was found guilty of

20  second-degree murder and attempted murder along with corresponding enhancements that he

21  personally used a firearm, personally discharged a firearm and caused great bodily injury or death

22  by using a firearm.  The jury was deadlocked on a separate attempted murder charge and a

23  mistrial was declared as to that charge.  Petitioner was sentenced to fifteen years to life for the

24  murder, seven years for the attempted murder and consecutive terms of twenty-five years to life

25  for the firearm enhancements.  Petitioner raises five claims in this federal habeas petition;

26  specifically:  (1) the trial court failed to dismiss the entire jury venire following the prosecutor's

                                   1

racially discriminatory use of peremptory challenges ("Claim I"); (2) the trial court failed to

dismiss the entire jury venire following the prosecutor's use of peremptory challenges against

women ("Claim II"); (3) the trial court erred in excluding two extra-judicial, exculpatory

statements of Petitioner that were necessary to rebut the prosecutor's argument that Petitioner

had not professed his innocence prior to his arrest ("Claim III"); (4) the trial court erred in

conducting an intrusive and coercive inquiry during the jury deliberations which targeted the one

holdout juror who was Asian ("Claim IV"); and (5) the trial court erred when it refused to

entertain Petitioner's request to discharge retained counsel and appoint new counsel for the post-

trial proceedings ("Claim V").  For the following reasons, the habeas petition should be denied.

## II.  FACTUAL BACKGROUND[1]

In June 2003, Lamson [Trong Pham] and Bruce [Huy Phan][2] were charged with the October 2002 murder ([Cal. Pen. Code] § 187) of Alan Khamphoumy, with personal discharge of a firearm causing great bodily injury or death (§ 12022.53, subd. (d)), and attempted murder of T.T. and V.D. with the same firearm allegations.  In August 2003, Sutter [Nguyen] was charged with the same offenses.

The trial court granted the prosecutor's motion to join the cases and denied Sutter's motion for severance.  An amended consolidated information was filed, charging all defendants with one count of murder and two counts of attempted murder, and alleging firearm enhancements and infliction of great bodily injury under sections 1203.06, 12022.5, 12022.7, and 12022.53.

The prosecution's theory was that defendants were involved in a Vietnamese street gang (though the case was not charged under the street gang statutes) and went looking for a confrontation with rival Laotian gang members and shot at unarmed people.  Lamson and Bruce claimed self-defense.  Sutter did not testify but maintained there was no evidence he was there or had anything to do with the crimes.

The evidence at trial included the following:

---

[1] The factual background is taken from the California Court of Appeal, Third Appellate District decision on direct appeal that was filed January 22, 2008 and is attached as Exhibit A to Petitioner's petition (hereinafter the "Slip Op.").

[2] Due to the similarity of the individuals' surnames, the individuals first names will be used throughout this findings and recommendations.

On the night of October 26, 2002, a Laotian family held a birthday party for a 16-year-old girl in and around the garage of their Sacramento residence.  Some of the attendees (including one of the people who was shot, T.T.) were involved in a Laotian street gang – LGC (Little Gangster Crips or Laotian Gangster Crips).

Also present were some Vietnamese who were involved in a Vietnamese street gang (JVP or Junior Viet(namese) Pride).

All defendants are Vietnamese.  Prosecution evidence indicated that in 1998 the police confirmed (validated [FN 2]) Sutter as a JVP gang member, and Lamson (though not validated as a member) associated with the JVP gang.  There was no evidence that Bruce was a gang member.

> [FN 2]  "Validation" means the police fill out a
> form concluding a person meets at least two of
> several criteria established by the police for
> determining gang membership.

There was conflicting evidence as to what happened.  One partygoer, S.K. (also known as Viet), testified he recognized Lamson at the party, having met him when they were both at the Boys' Ranch, where Lamson claimed affiliation with JVP.  S.K. admitted he was a member of LGC but said it was not an LGC party, and his friends did not have guns that night.  Partygoers (some of whom testified under a grant of use immunity) testified the two groups faced each other across the driveway.  The Vietnamese asked, "Where you all from?" (Which a gang expert explained was a challenge to fight).  One of the Laotians said, "LG."  The Vietnamese said, "LG What?" pulled out their guns and started shooting.

T.T., an LGC member (who testified he quit LGC before the party), heard gang taunts of, "where you from" and saw guns.  Unarmed, he backed away and tried to escape but was shot in the stomach.  V.D., a 17-year-old girl, was shot in the hip and leg.  [FN 3]  Alan Khamphoumy was shot and killed.

> [FN 3]  She had participated in Internet chat with
> two of defendants' group but denied mentioning the
> party to them.  One of them, John D., told the police
> he recognized the girl at the party as someone he
> knew "from being on-line."

Lamson and Bruce were stopped by police on the same street as the party as they tried to leave the scene in a Tahoe SUV.  The police noticed Lamson was bleeding (having been shot, perhaps accidentally, by one of his companions).  Two guns were found in the SUV, both of which were connected to casings found at the crime scene.  Bruce's fingerprints were on a gun (a Kimber .45),

3

which was matched to the bullet that killed Alan Khamphoumy, and gunshot residue was found on Bruce's palm.

Some but not all partygoers identified Lamson and/or Bruce in police line-ups.

As part of the investigation, police sought validated JVP members Sutter and Trung Nguyen, also known as Boy (a JVP leader or "shot caller"), but did not locate them.

Sutter was arrested months later, on June 24, 2003, when he was in a black Honda stopped by the police. After the driver emerged from the Honda, the front seat passenger – Boy – killed himself with a gunshot wound to the head. Sutter then emerged from the back seat, with a loaded gun in his waistband.

An earlier suicide by another person, Tan T., in March 2003, brought to light a .380 pistol that was matched to casings found at the crime scene and most likely fired a bullet that hit Lamson. Shell casings from four guns were found at the scene. The 27 shell casings found at the scene were of .45, .380, and nine-millimeter calibers. Ten were connected to the .45 Ruger and the .45 Kimber found in the vehicle of Lamson and Bruce and to the bullet found in the deceased Khamphoumy. Three .380 casings were from the gun later used by Tan T. to commit suicide. Fourteen casings and five slugs were traced to a nine-millimeter gun which was not recovered. Test firing of a gun found behind the fence at the scene of the party did not match any casings taken from the scene.

Lamson and Bruce testified at trial, and both testified that they and Sutter were at the party. Lamson and Bruce admitted they fired guns, but claimed they did so only in self-defense or defense of others.

Lamson denied JVP involvement but knew Boy was a JVP member. Lamson was told by Sutter that Sutter used to be JVP but left because he did not get along with the group. Lamson claimed he went to the party to meet girls and he was carrying a gun that night because he thought it would be "cool" to show to girls. He claimed he fired the gun in self-defense after others started shooting. Lamson said he saw Sutter at the party but did not remember seeing Sutter during the shooting. Lamson said he came out of the garage after dancing; someone shot at him; and he fired back. He got shot, and Bruce helped him to the SUV.

Bruce testified he was not a JVP member. He also claimed he carried a gun to impress girls. He said he fired only in defense of Lamson. Bruce said he came out of the garage, heard someone say, "Little Gangster Crip Nigga" and saw T.T. trying to shoot a gun but nothing came out. Bruce was unsure of the sequence of events but said Boy drew his gun and fired, and others drew guns,

4

including Sutter and John D.  Bruce said he drew his gun and fired after Viet shot Lamson.  Bruce first testified Sutter also pulled a gun and shot, but the next day testified he did not know whether Sutter did or not, and did not know what Sutter did during the shooting, and was only assuming Sutter was present because he (Bruce) saw someone who resembled Sutter at the party.  Bruce said he did not even know Sutter and saw him for the first time sitting in a car at the park that night.  Bruce said he, not Sutter, helped the injured Lamson.

John D., age 19 at the time of trial, testified he had been given use immunity and was awaiting trial for an unrelated murder.  John testified Boy was JVP, but John and Sutter were not.  John testified Boy and Tan T. [FN 5] picked up John in Boy's black Honda on the night in question, and they went to a park where they met up with Lamson and Bruce and some girls, and then Sutter arrived at the park.  Boy told the group that the ABZ [FN 6] gang was having a party.  The males in the group went to the party.  John testified that he, Sutter, Lamson, and Tan T. went with Boy in Boy's car.  At the party, John's group walked into the garage where the party was being held.  They all stood in the corner, except Lamson, who danced.  They saw some Laotians across the garage, looking at them in an unfriendly way.  John's group went outside to the driveway, except Lamson, who continued dancing.  The Laotians came out and faced John's group across the driveway and asked what "set" John's group was from.  One of John's group asked the same question of the Laotians, who said they were LGC.  Bruce pulled out a gun.  The Laotians said, "we're cool," as in "they didn't want no beef."  [FN 7]  John told the police he did not see any of the Laotians with a weapon.  Lamson came out of the garage holding himself and falling down.  John testified he was wrong when he told the police that the shooting started when Lamson pulled his gun; it actually started before Lamson came out of the garage.  John did not remember who shot first, but it was not Sutter because Sutter did not have a gun.  Sutter helped Lamson to Bruce's vehicle before leaving with John.  John testified he himself did not have a gun, and he ran to the car when the shooting started.  John testified it was Tan T., not Sutter (as John previously told the police), who fired the .380 pistol which Tan T. Later used to commit suicide.  John denied changing his story to protect Sutter and lay blame on the deceased Tan.  However, John admitted he lied to the police, which he attributed to his fear of being charged with the shooting.  He also admitted he testified incorrectly at trial that he never possess a gun (he said he misunderstood the question).  He possessed a gun on another occasion, but not on the night in question.

> [FN 5]  John D. acknowledged he did not
> previously tell the police about Tan T. being there.
> Bruce testified Tan was not there.

[FN 6]  The gang expert testified that ABZ (Asian Boys), a Crip set which was mainly Cambodian, associated with the Laotian gang LGC.

[FN 7]  Partygoer Phet B. testified T.T. walked towards defendants' group with his hands out to the side from his waist, palms facing forward.  The gang expert testified that approaching with hands out was an invitation to fight.  Phet B. testified defendants' group pulled out guns, and everyone else started backing up and ran when defendants' group opened fire.

Evidence was adduced that John D.'s trial testimony conflicted in part with his statements in a police interview on June 25, 2003, a (redacted) videotape of which was transcribed and played for the jury.  He told the police he was at the park with Boy, Lamson and Bruce on the night in question when Sutter arrived.  John and Sutter went with Boy in Boy's black Honda to the party.  After 10 or 20 minutes, they walked outside of the garage.  Some Laotians walked out, approached, and asked where they were from.  John backed up.  Bruce pulled a gun.  The Laotians said they were LGC.  Lamson then jumped out of the garage and pulled out a gun.  Sutter and Boy pulled out guns.  Bruce fired first, and then others started shooting, but John did not see who.  Sutter had a .380 AMT or AMG, which someone later borrowed to commit suicide.  After the shooting, Sutter helped Lamson to the SUV, then drove off with John and Boy.

Other than the three witnesses (John D. and codefendants Lamson and Bruce), no one placed Sutter at the crime scene.  Indeed, one of the victims testified he was acquainted with Sutter but did not see him at the party.  [FN 8]  Another witness, J.L., testified she saw Boy and John earlier in the evening in the parking lot of a pool hall.  She showed them where the party was.  No one else was in Boy's car at the time.  However, Boy and John did not stay at the party but left and returned later.

[FN 8]  One of the people who was shot, T.T., testified he knew Sutter from a prior mutual confinement in 1999 at Boys' Ranch but did not see him the night of the party.  When asked if he would have known Sutter had he seen him, T.T. said, "I wouldn't be so sure if that's him or not."  T.T. also said he was not there long enough to see who was there, and he had been drinking.  T.T. acknowledged he did not identify Sutter as one of the perpetrators in police line-ups; he did not really recognize Sutter in the line-ups and was not sure it was him.  T.T. said that at the Boys' Ranch he got along with Sutter, who said he used to be a gang

6

1
2
3
4

> member but no longer was.  T.T. said he was not
> sure if he would have recognized Sutter at the party
> "'cuz I never seen him in street clothes before."
> T.T. said he would have no reason to deny seeing
> Sutter if he had seen him.  T.T. testified he was also
> unable to say whether Lamson or Bruce was at the
> party.

5
6
7

> Sutter did not testify at trial.  His attorney argued to the jury that
> there was no evidence Sutter was even there that night, other than
> uncorroborated testimony of "accomplices" Lamson, Bruce and
> John D.

8    (Slip Op. at p. 2-10 (footnote omitted).)

9                         III.  PROCEDURAL HISTORY

10         Petitioner was convicted of the charges outlined in supra Part I and a mistrial was

11   declared on one of the attempted murder charges after the jury was deadlocked on that charge.

12   Petitioner appealed to the California Court of Appeal.  That court affirmed the judgment with

13   respect to Petitioner's Claims.  Petitioner's petition for review to the California Supreme Court

14   was summarily denied on May 14, 2008.

15         On July 23, 2009, Petitioner, proceeding with counsel, filed the instant federal habeas

16   petition.  On February 18, 2010, Respondent was granted an extension of time to file an answer

17   until February 28, 2010.  Respondent answered the petition on March 4, 2010 and filed a request

18   for relief from default and permission for late filing of the answer.  Default was never entered by

19   the Clerk of Court and Petitioner did not file any opposition to Respondent's four-day late filing

20   of his answer.  As such, Petitioner's request for relief from default will be denied as moot and his

21   request for late filing of the answer will be granted.  Petitioner filed a traverse on May 21, 2010.

22              IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

23         An application for writ of habeas corpus by a person in custody under judgment of a state

24   court can only be granted for violations of the Constitution or laws of the United States.  See 28

25   U.S.C. § 2254(a); see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1994); Middleton v.

26   Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).

1    Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism

2    and Effective Death Penalty Act of 1996 ("AEDPA") applies.  See Lindh v. Murphy, 521 U.S.

3    320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim

4    decided on the merits in the state court proceedings unless the state court's adjudication of the

5    claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

6    clearly established federal law, as determined by the Supreme Court of the United States; or (2)

7    resulted in a decision that was based on an unreasonable determination of the facts in light of the

8    evidence presented in state court.  See 28 U.S.C. 2254(d).

9        As a threshold matter, this Court must "first decide what constitutes 'clearly established

10    Federal law, as determined by the Supreme Court of the United States.'"  Lockyer v. Andrade,

11    538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)).  "'[C]learly established federal law'

12    under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court

13    at the time the state court renders its decision.'"  Id. (citations omitted).  Under the unreasonable

14    application clause, a federal habeas court making the unreasonable application inquiry should ask

15    whether the state court's application of clearly established federal law was "objectively

16    unreasonable."  See Williams v. Taylor, 529 U.S. 362, 409 (2000).  Thus, "a federal court may

17    not issue the writ simply because the court concludes in its independent judgment that the

18    relevant state court decision applied clearly established federal law erroneously or incorrectly.

19    Rather, that application must also be unreasonable."  Id. at 411.  Although only Supreme Court

20    law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in

21    determining whether a state court decision is an objectively unreasonable application of clearly

22    established federal law.  See Clark v. Murphy, 331 F.3d 1062, 1070 (9th Cir. 2003) ("While only

23    the Supreme Court's precedents are binding . . . and only those precedents need be reasonably

24    applied, we may look for guidance to circuit precedents.").

25        The first step in applying AEDPA's standards is to "identify the state court decision that

26    is appropriate for our review."  See Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005).

When more than one court adjudicated Petitioner's claims, a federal habeas court analyzes the last reasoned decision. Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)). In this case, the last reasoned decision on Petitioner's Claims was from the California Court of Appeal on direct appeal.

## V. ANALYSIS OF PETITIONER'S CLAIMS

### A. Claim I

In Claim I, Petitioner asserts that the trial court erred in failing to dismiss the entire jury venire due to the prosecutor's racially discriminatory use of peremptory challenges in violation of Batson v. Kentucky, 476 U.S. 79 (1986). The California Court of Appeal outlined the factual and legal underpinnings of this Claim and analyzed it as follows:

> Defendants contend their federal and state constitutional rights to an impartial jury were violated by the trial court's denial of their Batson/Wheeler motions (Batson v. Kentucky (1986) 476 U.S. 79 (Batson); People v. Wheeler (1978) 22 Cal.3d 258 (Wheeler) [overruled in part by Johnson v. California (2005) 545 U.S. 162 [162 L.Ed.2d 129]]), which claimed the prosecutor was exercising peremptory challenges on the impermissible basis of race/ethnicity and gender. We shall conclude there is no basis for reversal.

> 1. *Background*

> On November 9, 2005, Bruce made a Wheeler motion (with joinder by Lamson and Sutter, which also invoked Batson), claiming the prosecutor was systematically exercising peremptory challenges to remove minority prospective jurors - specifically:

> a. Jose R. [FN 22] (Hispanic);

> > [FN 22] Some of the parties use the prospective jurors' full names, and the People note the statute protecting juror's identities does not apply to prospective jurors. We see no need to use surnames.

> b. Irene M. (believed to be Hispanic);
> c. Amber D. (believed to be Hispanic);
> d. Wanda S. (Asian); and
> e. Clem C. (Filipino).

> Defense counsel asserted all remaining prospective jurors in the box, except one, were Caucasian. The trial court found the defense

9

had made a prima facie showing and asked the prosecutor to explain his reasons for excluding the minority jurors.

The prosecutor explained his reasons:  Jose R. said he was once stopped by police officers, who bent the truth about the encounter. Irene M. said she was raised in "the hood" and never had a problem, and the attitude with which she said that led the prosecutor to believe that she had special knowledge of gangs and had dealt with gang members and had no problem with gangs. Amber D. had a nephew serving a 25-year-to-life sentence for murder (thus she knew the penalty for murder) and had a relative involved in a self-defense issue (and self-defense was an issue in this case).  Wanda S. indicated defendants' faces and some of the names seemed familiar, and she knew Bruce's attorney from church.  Clem C. had been prosecuted and believed the jurors in his case were a "wanting to go home at 4:00 kind of jury," so he just pled guilty even though he felt he was not guilty.

The trial court found the prosecutor's reasons were neutral, plausible and legitimate.  The judge added he was expecting a defense motion based on the exclusion of women, though he noted it would be impossible for the prosecution to exclude all women because most of the panel were women.

Later in the proceeding, defendants brought a second Batson/Wheeler motion and asked the court to reconsider its earlier ruling in light of the prosecutor's exercise of peremptory challenges on prospective jurors Gilda B. (Hispanic) and Ms. M. (African American).  The prosecutor noted he still had unused peremptory challenges but was ready to accept the jury with two African Americans and one Asian on it.  The trial court acknowledged the make-up of the jury box was different this time. The prosecutor added, in light of renewal of the motion, an additional point concerning Amber D., questioning whether she was Hispanic and noting she was married and had a Spanish surname but was blonde and fair-skinned.  The court opined she was not very fair-skinned, and her blonde hair appeared to be dyed, but in any event "that ship's already passed us."

The prosecutor explained his reasons for excluding the two new people.  Gilda B. had a daughter with a DUI (which in itself did not bother the prosecutor) plus a brother-in-law who was prosecuted and convicted for serious offenses, including robbery and armed robbery at ATMs, three years ago, and Gilda B., attended those court proceedings.  The prosecutor was not willing to accept her statement that she could be fair.  As to Ms. M., she was a counselor at a college attended by Bruce and previously worked at a high school in South Central Los Angeles, where she had numerous contacts with gang members.  She acted as an advocate for students against professors and had students who were murdered and students who committed murders and robberies.  The prosecutor

also noted Ms. M. told the court she would want to leave at 4:15 p.m. to get to a class she taught and, when the court said it could not accommodate her, she tilted her eyeglasses down and stared at the judge for several seconds. The prosecutor said he did not have confidence that she would not be a "little bit hostile" about having to serve on the jury.

The court asked if defense counsel wanted to comment, at which point Sutter's lawyer said, "The only other thing I'd like to add in is the fact that most of the challenges appeared to be also women." Lamson's lawyer said the crimes involving Gilda B.'s brother-in-law were 15 years ago, not three (except a three-year-old case in which he was released), and Gilda B. said she felt he got what he deserved, and her demeanor was not as characterized by the prosecutor, and the prosecutor did not probe her feelings in depth. Lamson's lawyer noted by way of contrast that the prosecutor did not use peremptory challenges on other prospective jurors who themselves had prior convictions – one of which was a military criminal conviction for drug possession.

Lamson's lawyer said, "I do want to add that I think on reflection that there has also been a systematic use of his – of the prosecution's p[er]emptory challenges to exclude women from this jury. [¶] I believe all but maybe two [FN 24] of his challenges have been to women. And all of the last I think five or seven have been to women. [¶] The only two that I recall that were male were Mr. [N.] who, you know, loved the Constitution and his guns, and and [sic] the other one was Mr. [G.] who was Hispanic." The prosecutor said he also excluded Clem C. and Jose R. Defense counsel noted they were minorities.

> [FN 24] Bruce's appellate brief says it was all but three.

The judge observed he was the one who initially said he was expecting a defense motion based on exclusion of women, but as the judge looked at the panel, he realized there was a disproportionate number of women on the panel. Lamson's lawyer said the judge was "provoking" him into moving to strike the panel as unrepresentative of the community. When the court asked if he was making such a motion, counsel said yes, but he retreated when the court said such motions need a showing of numbers. The court said it would entertain such a motion if brought by the defense (which did not happen).

The prosecutor said he intended to make the point made by the judge, that the panel was almost exclusively women.

The court noted the current make-up of the jury was five men and seven women, which "sort of, you know, waters down that whole argument about, you know, there being too many women because

11

we do have five men and seven women."

The prosecutor argued that, given the makeup of the panel, there was no prima facie case of gender bias.

The trial court agreed, concluding there was no prima facie case of gender bias. The court repeated that the current constitution of the jury was five men and seven women. The court later added its recollection that it had granted hardship excuses to a lot of men. Returning to the matter of racial/ethnic bias, the prosecutor explained why he kept on the jury the person with the military case, which was in essence a civil action seeking reinstatement of a 19-year military pension which was taken away for smoking marijuana, which the prosecutor thought was a harsh penalty and nowhere close to the armed robberies of Gilda B.'s relative. The only other possible criminal matters of persons currently in the jury box were DUIs, which the prosecutor did not view as an issue because they were not comparable to armed robberies, and he did not think someone with a DUI would say, "well, I had a DUI so I'm going to walk these guys on murder."

The trial court stated that it was satisfied that the questioning of prospective jurors had not been cursory. The court found the prosecutor's reasons for excluding Gilda B. were genuine and legitimate, even though the prosecutor was mistaken about the dates, given that she had a family member involved in the criminal justice system for a very serious offense. The string of ATM robberies was 15 years ago, and the offender got out of prison three years ago. Gilda B. said she attended some of the court proceedings. The court found, based on Gilda B.'s answers, that the prosecutor had legitimate concerns which were the actual motivation for the exercise of the challenge. As to Ms. M., the court said it believed the prosecutor's reasons for excluding her were neutral and plausible.

2. *Analysis*

A prosecutor's use of peremptory challenges to strike prospective jurors on the basis of race, ethnicity or gender violates equal protection and the defendant's right to trial by a jury drawn from a representative cross-section of the community. (People v. Avila (2006) 38 Cal.4th 491, 541.) "When a defendant believes his or her constitutional rights are being violated by the exercise of a peremptory challenge, Batson requires that the defendant '[f]irst . . . make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [FN 25] [Citation.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial [or other class] exclusion" by offering permissible [class]-neutral justification for the strikes. [Citations.] Third, "[i]f a [class]-neutral explanation is

12

tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful [class] discrimination." [Citation.]' (Johnson v. California (2005) 545 U.S. 162, 168 . . . .) 'It is not until the third step that the persuasiveness of the justification becomes relevant – the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination.' [Citation.] The trial court is required to make a ""sincere and reasoned"" evaluation based on the circumstances before it. (People v. Reynoso (2003) 31 Cal.4th 903, 919.)" (People v. Hutchins (2007) 147 Cal.App.4th 992, 996-887, italics omitted.)

> [FN 25]  As we discuss post, the standard at the time of defendants' trial was whether the defendants showed a reasonable likelihood of impermissible discrimination.

The trial court must determine not only that a valid reason existed but also that it actually prompted the prosecutor's exercise of the peremptory challenge. (People v. Fuentes (1991) 54 Cal.3d 707, 720.) A trial judge is required to make a "'sincere and reasoned attempt to evaluate each stated reason as applied to each challenged juror. [Citations.] When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings. But when the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient.'" (People v. Stevens (2007) 41 Cal.4th 182, 193, citing People v. Silva (2001) 25 Cal.4th 345, 386.) The best evidence of whether a race-neutral reason should be believed is often the demeanor of the attorney who exercises the challenge, and evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within the trial judge's province. (People v. Stevens, supra 41 Cal.4th at p. 198.) Accordingly, we review the trial court's ruling under a substantial evidence standard. [FN 26] (Alvarez, supra 14 Cal.4th at pp. 196-197.)

> [FN 26]  Although Lamson's opening brief indicated substantial evidence review (stating his position that the prosecutor's reasons were unsupported by the record and/or inherently implausible), his reply brief cites federal cases for the asserted proposition that we must review the prosecutor's explanations de novo. We need not consider new arguments raised in the reply brief but note the federal cases indicated de novo review of the second step of the analysis, whether the prosecutor's stated reason is race-neutral on its face. (United States v. McCoy (9th Cir. 1994) 23 F.3d

216, 217.)

Defendants contend that a recent opinion of the United States Supreme Court – <u>Miller-El v. Dretke</u> (2005) 545 U.S. 231 [162 L.Ed.2d 196] – now requires appellate courts to engage in comparative juror analysis, in contrast to the prior California rule of <u>People v. Johnson</u> (1989) 47 Cal.3d 1194.  The parties note the issue is currently pending in the California Supreme Court (<u>People v. Lenix</u> (Jan.2, 2007, F048115) [nonpub. op.] review granted Jan. 24, 2007).  In recent cases, the California Supreme Court has elected to conduct such a comparative analysis rather than decide whether <u>Miller-El</u> compelled it to do so.  (E.g., <u>People v. Stevens</u>, <u>supra</u>, 41 Cal.4th 182, 196.)  We will do the same.

a.  *Race/Ethnicity*

Defendants contend the record shows the prosecutor's reasons for excluding minority jurors was pretextual.  We disagree.

i.  *Jose R.*

As indicated, the prosecutor's stated reason for exclusion of Jose R. was that he said he had been stopped by the police who "bended [*sic*] the truth."  [FN 27]

> [FN 27]  We disregard the Attorney General's unsupported and facially defective claim that the prosecutor's quotation of Jose R.'s words "bended [*sic*] the truth" meant the prosecutor was concerned about Jose R.'s ability to understand English.

Defendants argue the prosecutor's reason was mere pretext because, although Jose R. did say he was involved in a car crash while drunk and police "bended [*sic*] the truth just [a] little bit, "he also said he got what he deserved, was satisfied, had learned a lesson, and would be fair to both sides in this case.

However, the prosecutor was not required to accept on its face the prospective juror's assertion of impartiality and open-mindedness, despite his accusation that law enforcement officers lied.  Defendants cite no authority supporting their position.  To the contrary, a prospective juror's negative feelings about law enforcement may be a valid basis for exercising a peremptory challenge.  (<u>People v. Johnson</u> (1989) 47 Cal.3d 1194, 1215-1218.)  Although Jose R. was not as negative as the prospective jurors in <u>Johnson</u>, he did not need to be in order for the prosecutor to have a valid, non-discriminatory ground for excusing him.

Defendants add that Jose R. later revealed he owned a firearm and came from a family which hunted.  Defendants fail to show how that helps their case.

14

Defendants claim the trial court was wrong when it said the prosecutor had adequately questioned Jose R. about the issues troubling the prosecutor.  However, what the trial court said was:  "The questioning of all these jurors certainly by the Court has been rather extensive.  And I will note that in various forms counsels' questioning of the jurors have [*sic*] been quite extensive as well.  [¶]  And – and I do want to note that particularly [the prosecutor's] questioning of the jurors or at least some of the jurors, have – has been – has been quite, quite extensive.  He's gone into a number of things with several different jurors.  [¶]  And I – I will note that the areas that the prosecutor covered relative to the five affected jurors that [defense counsel] mentioned, those were areas that [the prosecutor] went into quite a bit.  It wasn't as though he went into it in limited fashion.  You know, he kind of he [*sic*] kept going into certain areas."  Thus, the trial court was speaking of the prospective jurors as a group.  Even assuming the prosecutor never asked any specific questions of Jose R., that does not demonstrate grounds for reversal.  The trial court adequately questioned Jose R.  Moreover, the prosecutor was not required to probe after Jose R. accused law enforcement officers of lying.

Defendants fail to show grounds for reversal with respect to Jose R.

ii.  *Irene M.*

The prosecutor said he excluded Irene M., not merely because she said she was raised in "the hood" and never had a problem with gangs, but because the attitude with which she said it led the prosecutor to believe that she had special knowledge of gangs and had dealt with gang members and had no problem with gang members.

Defendants claim Irene M. said her awareness of gangs came from hearing her mother and other women discuss having seen gang members in stores.  However, what she said was that, as she was growing up, she knew individuals who were allegedly in gangs.  When asked if she had personal experience with gang members, she said, "Not per s[e] that they did this or – or but, you know, you sort of knew neighborhoods because maybe the mothers would – would discuss it with – with other mothers.  They might have seen them at the grocery stores or something like that."

Defendants say the record does not support the prosecutor's assertion that Irene M. had special knowledge or had dealt with gangs.  They also cite Irene M.'s statement that her experience would not affect her ability to be fair, nor would it cause her automatically to believe or disbelieve testimony of gang members or associates.

However, defendants neglect to acknowledge that the prosecutor,

in giving his reasons regarding Irene M., pointed not only to her words, but also her "attitude." This was a matter for assessment by the trial court, which had the opportunity to observe the prospective juror. The court implicitly accepted the prosecutor's view.

Defendants contend the prosecutor's reasons regarding Irene M. were a sham, because the prosecutor kept on the jury two persons (Jurors 7 and 11), each of whom had experience with or exposure to gangs at least as extensive as Irene M. Again, defendants fail to acknowledge the prosecutor's reference to Irene M.'s attitude, which is a matter for the trial judge who observed her, not for a reviewing court working with a cold record.

Defendants fail to show grounds for reversal with respect to Irene M.

iii.  *Amber D.*

The prosecutor excluded Amber D. because she had a nephew serving 25 years to life for murder (thus she knew the penalty for murder) and had another nephew involved in a shooting who was not charged because the prosecution concluded he acted in defense of his mother during a domestic violence incident. The prosecutor noted self-defense was an issue in this case.

Defendants argue Amber D. was not that close to either nephew's case, and the self-defense case was 15 years ago, and she said she could remain impartial. Defendants contend Amber D. had other facets that would make her seem to be pro-prosecution, i.e., she had been a victim of several crimes and had a brother-in-law who was a prison guard. Again, however, the prosecutor was not required to come to the same assessment as defendants.

Defendants argue by comparison that the prosecutor allowed to remain on the jury persons who had been convicted of crimes or had friends convicted of crimes. One juror had two DUIs, another had a dishonorable discharge for marijuana, and another had a friend who was shot and killed and the defendant asserted self-defense.

However, none of these jurors knew anyone serving prison time for murder. Knowing a murder victim is different than knowing a murderer. Moreover, the prosecutor adequately explained he did not consider DUIs or marijuana use significant enough to prejudice a juror against the prosecutor in a murder case.

Thus, even assuming Amber D. was a minority, defendants fail to show grounds for reversal with respect to her.

16

iv.  *Wanda S.*

Wanda S. said the defendants' faces and some of the names seemed familiar, and she knew Bruce's attorney from church.  The prosecutor said, "I was not gonna wait and see mid-trial when it came to her or she ended up recognizing somebody, how those chips had fall [*sic*], so she was excused."

Defendants argue there were other facets of Wanda S. that might favor the prosecution, i.e., she knew police officers socially, her brother-in-law was an assault/robbery victim, she was a burglary victim, the school where she worked had been tagged with gang graffiti, and she had knowledge of gangs from gang prevention workshops.

None of this undermines the prosecutor's undeniably valid reason that this juror knew one of the defense attorneys from church.

v.  *Clem C.*

The prosecutor explained he excused Clem C. because he had been prosecuted and believed the jurors in his case were a "wanting to go home at 4:00 kind of jury," so he just pled guilty even though he felt he was not guilty.

Defendants point out Clem C. also said he blamed himself for his legal troubles, in that he was accused of carrying a concealed weapon without a permit after he placed a gun in his garment bag to hide it from his toddler son and forgot about the gun until it triggered the metal detector at the airport.  Defendants also note Clem C. was an auditor with the Environmental Protection Agency, had previously served on a jury, had a sister who was a judge, and had relatives who worked at the Department of Justice and District Attorney's Office.

None of these points renders pretextual the prosecutor's explanation.  Although Clem C. blamed himself, he disparaged his jury and indicated resentment about his criminal conviction.

vi.  *Gilda B.*

The prosecutor explained his reasons for excluding Gilda B.:  She had a brother-in-law who was convicted of serious offenses, including robbery and armed robbery at ATMs, three years ago, and Gilda B. attended those court proceedings.  The prosecutor was not willing to accept her statement that she could be fair.

That the robberies were 15 years ago rather than three is of no consequence, since the trial court concluded it was a mistake by the prosecutor rather than an intentional misrepresentation, and the crimes were serious.  Contrary to the defense argument, the

17

prosecutor did not place "great emphasis" on the year the crime was committed.  Defendants assert the prosecutor did not probe Gilda B. to the same depth as the person with the military discharge; Gilda B.'s cousin worked in law enforcement; and Gilda B. said she believed her felon brother-in-law got what he deserved.

None of these points demonstrates reversible error.  Lamson cites People v. Turner (1986) 42 Cal.3d 711 at page 727, for the proposition that a prosecutor's failure to engage prospective jurors in more than desultory voir dire is a factor supporting an inference that the challenge was based on group bias.  However, that statement in Turner related to the prosecutor's explanation that he excused a Black prospective juror because she said she could not sit impartially because she was a mother of children.  (Id. at pp. 726-727.)  The Supreme Court observed her comment was much more ambiguous and was unexplored by the prosecutor.  (Ibid.)

Here, in contrast, it is undisputed that the prospective juror had a brother-in-law who was convicted of armed robberies.  This fact in itself justified the prosecutor's decision, and he was not required to take up court time in useless probing.  We note the voir dire transcript consumed over 1,000 pages of the transcript.

vii.  *Ms. M.*

As to Ms. M., the prosecutor said she was a counselor at a college attended by Bruce and previously worked at a high school in South Central Los Angeles, where she had numerous contacts with gang members.  She acted as an advocate for students against professors and had students who were murdered and students who committed murders and robberies.  The prosecutor also noted Ms. M. told the court she would want to leave at 4:15 p.m. to get to a class she taught and, when the court said it could not accommodate her, she said, "oh, I heard you," tilted her eyeglasses down and stared at the judge for several seconds.  The prosecutor did not have confidence that she would not be a "little bit hostile" about having to serve on the jury.

Defendants note:  Ms. M. had served on a criminal jury which reached a verdict; her brother used to be a state police officer; she had gang training as a teacher and gang members as students; and she had former students in Los Angeles who were victims of crime involving gangs.

None of these points demonstrates grounds for reversal.  The trial judge was in the best position to assess the prosecutor's point about Ms. M's attitude.

We conclude defendants fail to show that the prosecutor impermissibly excluded jurors on the basis of race or ethnicity.

1  (Slip Op. at p. 63-79.)

2           i.  Applicable Law

3       To establish a <u>Batson</u> claim, the defendant must first make a prima facie showing that a

4  challenge was made on an impermissible basis, such as race.  476 U.S. at 96; <u>see</u> <u>also</u> <u>Johnson v.</u>

5  <u>California</u>, 545 U.S. 162, 170-71 (2005).  To establish a prima facie case, a petitioner must show

6  that (1) the prospective juror is a member of a cognizable racial group, (2) the prosecutor used a

7  peremptory strike to remove the juror, and (3) the totality of the circumstances raises an inference

8  that the strike was motivated by race.  <u>See</u> <u>Boyd v. Newland</u>, 467 F.3d 1139, 1143 (9th Cir.

9  2006) (citing <u>Batson</u>, 476 U.S. at 96).  Where the defendant has made a prima facie showing of

10  discrimination, the burden shifts to the prosecutor to offer a race-neutral reason for the challenge

11  that relates to the case.  <u>See</u> <u>Johnson</u>, 545 U.S. at 168.  Where the prosecutor offers a race-neutral

12  explanation for the challenge, the trial court decides whether the defendant has proved the

13  prosecutor's motive for the challenge was purposeful racial discrimination.  <u>See</u> <u>id.</u>; <u>Batson</u>, 476

14  U.S. at 98.  The opponent of the strike has the ultimate burden of persuasion regarding racial

15  motivation.  <u>See</u> <u>Purkett v. Elem</u>, 514 U.S. 765, 768 (1995) (per curiam).  An en banc panel of

16  the Ninth Circuit in <u>Kesser v. Cambra</u>, 465 F.3d 351, 359-60 (9th Cir. 2006) (en banc) discussed

17  at length the requirements of a court in analyzing the third step of a <u>Batson</u> issue:

18           At this stage, "the trial court determines whether the opponent of
         the strike has carried his burden of proving purposeful
19           discrimination."  <u>Purkett</u>, 514 U.S. at 768.  Although the burden
         remains with the defendant to show purposeful discrimination, the
20           third step of <u>Batson</u> primarily involves the trier of fact.  After the
         prosecution puts forward a race-neutral reason, the court is
21           required to evaluate "the persuasiveness of the justification."  <u>Id.</u>
         To accept a prosecutor's stated nonracial reasons, the court need
22           not agree with them.  The question is not whether the stated reason
         represents a sound strategic judgment, but "whether counsel's race-
23           neutral explanation for a peremptory challenge should be
         believed."  <u>Hernandez v. New York</u>, 500 U.S. 352, 365 (1991)
24           (plurality opinion).  "It is true that peremptories are often the
         subjects of instinct," and that "it can sometimes be hard to say
25           what the reason is."  <u>Miller-El</u>, 125 S.Ct. at 2332.  "But when
         illegitimate grounds like race are in issue, a prosecutor simply has
26           got to state his reasons as best he can and stand or fall on the

19

plausibility of the reasons he gives." Id.  "While subjective factors may play a legitimate role in the exercise of challenges, reliance on such factors alone cannot overcome strong objective indicia of discrimination. . . ."  Burks v. Borg, 27 F.3d 1424, 1429 (9th Cir. 1994).

The trier of fact may not turn a blind eye to purposeful discrimination obscured by race-neutral excuses.  "[T]he prosecutor must give a 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges."  Batson, 476 U.S. at 98 n. 20 (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 258 (1981)).  "A Batson challenge does not call for a mere exercise in thinking up any rational basis."  Miller-El, 125 S.Ct. at 2332.  Reasons must be "related to the particular case to be tried."  Batson, 476 U.S. at 98.  "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination."  Purkett, 514 U.S. at 768.

The court need not accept any proffered rationale.  We have recognized that "[w]hen there is reason to believe that there is a racial motivation for the challenge, neither the trial courts nor we are bound to accept at face value a list of neutral reasons that are either unsupported in the record or refuted by it."  Johnson, 3 F.3d at 1331.  The court must evaluate the record and consider each explanation within the context of the trial as a whole because "'[a]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts.'"  Hernandez, 500 U.S at 363, 111 S.Ct. 1859 (quoting Washington v. Davis, 426 U.S. 229, 242 (1976)); see also Miller-El, 125 S.Ct. at 2324 (noting that Batson requires inquiry into "'the totality of the relevant facts' about a prosecutor's conduct" (quoting Batson, 476 U.S. at 94, 106 S.Ct. 1712)); Batson, 476 U.S. at 93, 106 S.Ct. at 1712 ("In deciding if the defendant has carried his burden of persuasion, a court must undertake a sensitive inquiry into such circumstantial and direct evidence as may be available." (internal quotation marks omitted)).  A court need not find all nonracial reasons pretextual in order to find racial discrimination.  "[I]f a review of the record undermines the prosecutor's stated reasons, or many of the proffered reasons, the reasons may be deemed a pretext for racial discrimination."  Lewis v. Lewis, 321 F.3d 824, 830 (9th Cir. 2003); see also United States v. Chinchilla, 874 F.2d 695, 699 (9th Cir. 1989) ("Thus, the court is left with only two acceptable bases for the challenges. . . . Although these criteria would normally be adequately 'neutral' explanations taken at face value, the fact that two of the four proffered reasons do not hold up under judicial scrutiny militates against their sufficiency.").

See also Green v. LaMarque, 532 F.3d 1028, 1030 (9th Cir. 2008) (discussing the court's inquiry

at the third step of a Batson analysis).

20

1    "'If a prosecutor's proffered reason for striking a [minority] panelist applies just as well

2    to an otherwise - similar [nonminority] who is permitted to serve, that is evidence tending to

3    prove purposeful discrimination to be considered at <u>Batson's</u> third step.'"  <u>Kesser</u>, 465 F.3d at

4    360 (quoting <u>Miller-El</u>, 125 S.Ct. at 2325).  Furthermore, "'the Constitution forbids striking even

5    a single prospective juror for a discriminatory purpose.'"  <u>United States v. Collins</u>, 551 F.3d 914,

6    919 (9th Cir. 2009) (quoting <u>United States v. Vasquez-Lopez</u>, 22 F.3d 900, 902 (9th Cir. 1994)).

7    Therefore, each of the seven potential jurors that Petitioner claims were impermissibly struck by

8    the prosecution must be separately analyzed under the <u>Batson</u> framework.

9            ii.  Jose R.

10          The trial court found that Petitioner had satisfied his prima facie case with respect to the

11    strike against Jose R.  (<u>See</u> Voir Dire Tr. at p. 813.)  The prosecutor then stated his reason for

12    striking Jose R. which was the following:  "this was the individual who said that he was stopped

13    by police officers.  And I think his quote was they bended (sic) the truth in reference to his

14    encounter with police officers.  So given that circumstance he was not going to be a sitting

15    juror."  (<u>Id.</u>)  The trial court determined that this was a neutral reason and was plausible and that

16    it saw the strategy by the prosecution.  (<u>See id.</u> at p. 816.)  The California Court of Appeal noted

17    this and found no reason for reversal due to the strike against Jose R.  For the following reasons,

18    the state court's determination that Petitioner failed to establish that the prosecutor's strike

19    against Jose R. was pretextual was not an objectively unreasonable application of clearly

20    established federal law.

21          During the voir dire proceedings, the following colloquy took place between Jose R. and

22    the court:

23          THE COURT:  Have you close, friend or relative ever been the
            victim of a crime? . . .
24          Q:  Okay.  All right. [Jose R.], sir?
            A:  I was driving under the influence.  That lead into an accident.  I
25          crashed my vehicle and was arrested.  Well, yeah, was arrested for
            like a day or so and let me go.
26          Q:  How long ago was this, sir?

21

A:  About three years ago.
Q:  Was that here in Sacramento County?
A:  Yes.
Q:  Were you satisfied with the manner in which you were treated by law enforcement?
A:  To somewhat extent.  I feel that – they bended (sic) the truth just a little bit.  They said things that I really didn't do but –
Q:  Okay.
A:  – I understand that.  I was intoxicated and I did, you know – driving under the influence.  But some things about it just weren't right, but I got what I deserved.
Q:  Okay.
A:  So – and overall I was satisfied because I learned a lesson from it.  And just isn't going to happen again.  But I can see how someone could bend the truth just a little bit.
Q:  All right.  Well, let me ask you this.  You may or may not have officers testifying in this trial.  [¶]  Based on what happened to you, do you think that you would have a tendency to just totally disbelieve an officer any time they testify?
A:  No.  Not at all.
Q:  All right.  So you think that the incident involving you is just peculiar to you?
A:  It could happen to someone else.  But I mean, that incident just happened to me.  From what I experienced that was only on me.  But I – I'm open to look at all the evidence.  And looking at all the facts and judging for myself if someone is guilty or not.

(Voir Dire Tr. at p. 365-67.)

As the above colloquy indicates, prospective juror Jose R. believed that law enforcement "bended the truth" with respect to his DUI.  A prosecutor's reason for excusing a prospective juror because of his negative experience with the police constitutes a valid, race neutral reason for using a peremptory strike under federal law.  See Mitleider v. Hall, 391 F.3d 1039, 1048 (9th Cir. 2004); United States v. Vaccaro, 816 F.2d 443, 457 (9th Cir. 1987).  Petitioner failed to satisfy his burden showing that the prosecutor's reason for striking Jose R. was pretextual based on this record.  Jose R. testified that he believed law enforcement "bended the truth."  The prosecutor's rationale for striking Jose R. was supported and not refuted by the record.  Petitioner failed to show that prosecutor's reason for striking Jose R. was pretextual.  Therefore, he is not entitled to federal habeas relief based on the use of a peremptory strike against Jose R.

//

iii.  Irene M.

Next, Petitioner argues that the prosecutor's use of a peremptory strike against Irene M. violated <u>Batson</u>.  Petitioner argued to the trial court that the prosecutor struck Irene M. because she is Hispanic.  (See Voir Dire Tr. at p. 809.)  The trial court found that the Petitioner had satisfied his prima facie case and asked the prosecutor to give his reasons for striking Irene M.  (See <u>id.</u> at p. 812-13.)  The prosecutor stated the following with respect to striking Irene M:  "[s]he's the one that indicated that she had been raised in the hood and had never had a problem.  [¶]  In my mind, she had special knowledge of gangs and – the attitude in which she said that led me to believe that her mind-set was that she's dealt with gang members in the past and had no problems with gang members.  So she was not going to be a sitting juror as well."  (Voir Dire Tr. at p. 813-14.)  The trial court found that the prosecutor's reason for striking Irene M. was plausible and stated that he saw "the strategy by the prosecution."  (<u>Id.</u> at p. 816.)  The California Court of Appeal did not reverse the trial court's finding and specifically noted that the prosecution based this strike on Irene M's attitude.  For the following reasons, the strike against Irene M. does not warrant federal habeas relief as Petitioner failed to show that the state court's decision was an unreasonable application of clearly established federal law.

During the voir dire proceedings, the following colloquy took place between the court and Irene M.:

> Q:  Prospective juror number four, [Irene M.], what do you want to tell us?
> A:  I was raised in the hood and with different cultures.  My parents still live there in the area.  And they've never had – our family's never had any problems with different gang members with stuff like that.
> Q:  Did you know any of the individuals who were allegedly in gangs from your own neighborhood?
> A:  As I was growing up, yes.
> Q:  Okay.  All right.  So you've actually had personal experience with gang members or former gang members for that matter?
> A:  Not per say [sic] that they did this or – or but, you know, you sort of knew neighborhoods because maybe the mothers would – would discuss it with – with other mothers.  They might have seen them at the grocery stores or something like that.

23

1
2
3
4
5
6
7
8
9

Q:  All right.  Well, would your – and – and you used the term you used I used to live in the hood.
A:  Well –
Q:  I understood what you were saying, in the neighborhood.
A:  Well, in the neighborhood where there's – it's still – still is, you know, gang members of different cultures.
Q:  Well, would that automatically cause you to believe or disbelieve the testimony of someone who was proven to, you know, be a gang member or gang associate or a gang or affiliated with a gang in any manner?
A:  No.
Q:  No?
A:  No.
Q:  All right.  And would it affect your ability to function as a fair and impartial juror?  Would it affect your ability to function as a fair and fair impartial juror?
A:  No.  Not at all.

10   (Id. at p. 511-12).  The prosecutor based his strike on Irene M.'s attitude.  As the United States

11   Supreme Court has explained, "[t]he trial court has a pivotal role in evaluating Batson claims.

12   Step three of the Batson inquiry involves an evaluation of the prosecutor's credibility, and the

13   best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises

14   the challenge."  Snyder v. Louisiana, 552 U.S. 472, 477 (2008) (internal quotation marks and

15   citation omitted).

16
17
18
19
20
21

[R]ace-neutral reasons for peremptory challenges often invoke a juror's demeanor (e.g. nervousness, inattention), making the trial court's first-hand observations of even greater importance.  In this situation, the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor.  We have recognized that these determinations of credibility and demeanor lie peculiarly within a trial judge's province, and we have stated that in the absence of exceptional circumstances, we would defer to [the trial court].

22   Id.  Thus, "deference is especially appropriate where a trial judge has made a finding that an

23   attorney credibly relied on demeanor in exercising a strike."  Id. at 479.

24         Petitioner relies on Snyder, 552 U.S. 472 to support his argument that the strike against

25   Irene M. was discriminatory.  (See Pet'r's Pet. at p. 11 ("[T]he state appellate court's response to

26   the absence of any trial court determination concerning 'attitude' was simply to infer it, which

24

1    was precisely the approach adopted by the state court in Snyder and rejected by the Supreme

2    Court.").)  Thaler v. Haynes, 130 S.Ct. 1171 (2010) discussed the holding in Snyder.

3         In Thaler, two different judges presided during voir dire, one when the attorneys

4    questioned the prospective jurors individually and one who took over when peremptory

5    challenges were exercised.  See 130 S.Ct. at 1172.  In Thaler, the prosecutor's stated reason for

6    striking a prospective juror was that the prospective juror's demeanor "had been 'somewhat

7    humorous' and not 'serious' and that her 'body language' had belied her 'true feeling.'" 130

8    S.Ct. at 1172.  After considering the prosecutor's stated reasons, the trial judge stated that the

9    reason was race-neutral and denied the Batson objection without further explanation.  Id.  The

10   United States Court of Appeals for the Fifth Circuit had held as follows:

11            In this case, the trial court and the state appellate court did not
             conduct a "factual inquiry" or a "sensitive" inquiry into the
12           demeanor-based reasons because neither court applied the relevant
             observations of the juror's demeanor despite the trial court's role
13           and experience overseeing the individual voir dire.  The state
             appellate court in this case found that both the trial judge and the
14           appellate court made their Batson determinations from the same
             appellate fact-finding position, i.e., from the cold paper record, and
15           therefore the state court concedes there was no trial fact-finding.
             The state appellate court concluded:
16
                  Because the trial judge did not witness the actual
17                voir dire at issue his position as a fact-finder with
                  regard to the demeanor of the venire members at
18                issue is no better than that of this Court.  Thus we
                  owe him no deference . . . . But regardless of
19                whether the trial judge referred to the record, any
                  concern arising from this situation is moot, because
20                we have not given deference and have ourselves
                  reviewed the voir dire record.
21
             Taking this conclusion to its logical end, we cannot
22           correspondingly apply AEDPA deference to the state court,
             because the state courts engaged in pure appellate fact-finding for
23           an issue that turns entirely on demeanor.  It is clearly established
             that the cold record cannot accurately reveal the demeanor of live
24           trial participants.  Therefore, no court, including ours, can now
             engaged in a proper adjudication of the defendant's demeanor-
25           based Batson challenge as to prospective juror Owens because we
             will be relying solely on a paper record and would thereby
26           contravene Batson and its clearly-established "factual inquiry"

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

requirement.  See, e.g., Synder, 128 S.Ct. at 1207; Batson, 476
U.S. at 95.

Haynes v. Quarterman, 561 F.3d 535, 541 (5th Cir. 2009) (internal citations and footnote

omitted), rev'd, Thaler, 131 S.Ct. 1171.  The Fifth Circuit granted the petitioner's request for

habeas relief.  See id.  Nevertheless, the United States Supreme Court reversed the Fifth Circuit's

decision and stated the following:

> In holding that respondent is entitled to a new trial, the Court of
> Appeals cited two decisions of this Court, Batson and Snyder, but
> neither of these cases held that a demeanor-based explanation for a
> peremptory challenge must be rejected unless the judge personally
> observed and recalls the relevant aspect of the prospective juror's
> demeanor.
>
> The Court of Appeals appears to have concluded that Batson
> supports its decision because Batson requires a judge ruling on an
> objection to a peremptory challenge to "'undertake a "sensitive
> inquiry into such circumstantial and direct evidence of intent as
> may be available.""'  561 F.3d at 540 (quoting Batson, 476 U.S. at
> 93, in turn quoting Arlington Heights v. Metropolitan Housing
> Development Corp., 429 U.S. 252, 266 (1977)).  This general
> requirement, however, did not clearly establish the rule on which
> the Court of Appeals' decision rests.  Batson noted the need for a
> judge ruling on an objection to a peremptory challenge to "tak[e]
> into account all possible explanatory factors in the particular case."
> 476 U.S. at 95 (internal quotation marks omitted).  See also Miller-
> El v. Dretke, 545 U.S. 231, 239 (2005); Johnson v. California, 545
> U.S. 162, 170 (2005).  Thus, where the explanation for a
> peremptory challenge is based on a prospective juror's demeanor,
> the judge should into account, among other things, any
> observations of the juror that the judge was able to make during the
> voir dire.  But Batson plainly did not go further and hold that a
> demeanor-based explanation must be rejected if the judge did not
> observe or cannot recall the juror's demeanor.
>
> Nor did we establish such a rule in Snyder.  In that case, the judge
> who presided over the voir dire also ruled on the Batson
> objections, and thus we had no occasion to consider how Batson
> applies when different judges preside over these two stages of the
> jury selection process.  Snyder, 552 U.S. at 475-78.  The part of
> Snyder on which the Court of Appeals relied concerned a very
> different problem.  The prosecutor in that case asserted that he had
> exercised a peremptory challenge for two reasons, one of which
> was based on demeanor (i.e., that the juror had appeared to be
> nervous), and the trial judge overruled the Batson objection
> without explanation.  552 U.S. at 478-79.  We concluded that the
> record refuted the explanation that was not based on demeanor and,

1     in light of the particular circumstances of the case, we held that the
2     peremptory challenge could not be sustained on the demeanor-
     based ground, which might not have figured in the trial judge's
3     unexplained ruling. Id. at 47986. Nothing in this analysis supports
     the blanket rule on which the decision below appears to rest.

4     The opinion in Snyder did note that when the explanation for a
     peremptory challenge "invoke[s] a juror's demeanor," the trial
5     judge's first hand observations" are of great importance. Id. At
     477. And in explaining why we could not assume that the trial
6     judge had credited the claim that the juror was nervous, we noted
     that, because the peremptory challenge was not exercised until
7     some time after the juror was questioned, the trial judge might not
     have recalled the juror's demeanor. Id. at 479. These observations
8     do not suggest that, in the absence of a personal recollection of the
     juror's demeanor, the judge could not have accepted the
9     prosecutor's explanation. Indeed, Snyder, quoted the observation
     in Hernandez v. New York, 500 U.S. 352, 365 (1991) (plurality
10     opinion), that the best evidence of the intent of the attorney is
     exercising a strike is often that attorney's demeanor. See 552 U.S.
11     at 477.

12     Accordingly, we hold that no decision of this Court clearly
     establishes the categorical rule on which the Court of Appeals
13     appears to have relied.

14  Thaler, 130 S.Ct. at 1174-75.

15       Thaler's analysis of Snyder is relevant to Petitioner's case. In both Thaler and

16  Petitioner's case, the sole rationale for the strike was based on the prospective juror's demeanor.

17  As in Thaler, the state court did not apply relevant observations to the demeanor based strike. In

18  Thaler, the Supreme Court determined that state court did not unreasonably apply clearly

19  established federal law. Petitioner's case is unlike Snyder whereby there were two rationales and

20  the non-demeanor based rationale was found to be implausible based on the record.[3] Here, like

21

22      [3] Judge Singleton also similarly distinguished Snyder in co-defendant Pham's federal
     habeas petition. See Pham v. Stainer, Civ. No. 08-2191, 2011 WL 3438440, at *4 n. 34 ( E.D.
23     Cal. Aug. 5, 2011) ("In Snyder, in response to a Batson motion, the prosecutor provided two
     reasons for dismissing a prospective minority juror Mr. Brooks: Brooks' nervous demeanor, and;
24     the fact that Brooks had a student-teaching obligation which would be negatively impacted if he
     was required to serve on the jury. The trial court accepted the prosecutor's justifications without
25     explicitly ruling on Brooks' demeanor. On appeal, the Ninth Circuit found that Brooks' student-
     teaching obligation would not interfere with his jury service. The court then held that, because
26     the trial court had not ruled on Brooks' demeanor, it could not presume that the trial judge
     credited the prosecutor's assertion that Brooks was nervous. The court concluded the trial judge

1    in Thaler, there was only one rationale for the strike given by the prosecutor that was based on

2    the prospective juror's demeanor.  Accordingly, as in Thaler, the Court of Appeal's decision with

3    respect to the strike against Irene M. was not an unreasonable application of clearly established

4    federal law.

5        Petitioner also argues that he is entitled to federal habeas relief based on 28 U.S.C. §

6    2254(d)(2).  As the Ninth Circuit has stated:

7           To meet the "unreasonable determination" standard under §
8           2254(d)(2), the habeas court "must be convinced that an appellate
            panel . . . could not reasonable conclude that the finding is
9           supported by the record . . . [or] that any appellate court to whom
            the defect is pointed out would be unreasonable in holding that the
            state court's fact-finding process was adequate." Taylor v.
10          Maddox, 366 F.3d 992, 1000 (9th Cir. 2004) (internal citations
            omitted).  "[T]he state-court fact-finding process is undermined
11          where the state court has before it, yet apparently ignores, evidence
            that supports petitioner's claim."  Id. at 1001.

12

13    Ocampo v. Vail, 649 F.3d 1098, 1106 (9th Cir. 2011), pet. cert. filed, No. 11-614 (Nov. 14,

14    2011).  Petitioner argues in his petition that comparative juror analysis illustrates that the

15    prosecutor's reason for striking Irene M. was pretextual.  Specifically, he argues that juror

16    numbers 7 and 11 were similar to Irene M., yet were not struck by the prosecutor.  As previously

17    noted, "'[i]f a prosecutor's proffered reason for striking a [minority] panelist applies just as well

18    to an otherwise - similar [nonminority] who is permitted to serve, that is evidence tending to

19    prove purposeful discrimination to be considered at Batson's third step.'"  Kesser, 465 F.3d at

20    360 (quoting Miller-El, 125 S.Ct. at 2325).  The following colloquy took place between the court

21    and juror number 11:

22           Q:  Does anyone here live in a neighborhood frequented by
            criminal street gangs? . . . .
23           A: Well, honestly, don't we all?  I mean, it's almost that you can't

24 _____

25    may have found it unnecessary to consider Brooks' demeanor, instead basing his ruling
    completely on the second proffered justification for the strike.  Snyder is distinguishable from the
26    facts of Pham's case because, unlike the prosecutor in Snyder, the prosecutor in Pham's case only
    gave one reason for dismissing Irene M.").

1    get away from it.  I don't live in the middle of it but it's always
     around you you know.  [¶]  And I grew up in – the area I grew up it
2    was always around.  I went to high school and junior high in areas
     that I have that – so – but as far as frequented, you know, seeing on
3    the street, no.  But I would have to say I live in the area then, yeah.
     Q:  Okay.  Well, have you had any personal experience with street
4    gangs?
     A:  No.
5    Q:  All right.  And would you automatically believe or
     automatically disbelieve the testimony of a person simply because
6    that person may be a gang member and/or associated gangs?
     A:  No, sir.
7    Q:  All right.  And would that in any way affect your ability to
     function as a fair and impartial juror?
8    A:  No, sir.

9    (Voir Dire Tr. at p. 504, 506-07.)

10          Additionally, the following colloquy took place between the court and juror number 7

11   during the voir dire proceedings:

12          A:  The only other thing I wanted to say is I also have had – like
            the drug identification – I mean, not drug – well, drug and gang
13          kind of – of classes where you learn to identify the different
            gangs.  [¶]  I do know antiodatally [sic] of the gangs.  And I've had
14          experiences where I've had to get gang members off of campus.
            I'm a soccer coach and occasionally we've had incidents during
15          practice where I've had to threaten to call the police at things like
            that.  I just wanted to the people to know that, too.
16          Q:  Now, you indicated that you know some of the gangs.  [¶]  Do
            you know – do you know some of these gangs by name?
17          A:  Yeah.  I – I we don't deal with Asian boys as much.  But I have
            a lot of antidotal evidence or not evidence, but I've heard things
18          about them.  [¶]  We have – there's a couple of Asian gangs in
            other area.  But, you know, we talk with the principles about, you
19          know, various gangs just so we know.
            Q:  Have you ever heard of JVP or Junior Viet Pride?
20          A:  Yeah.  I'm not familiar of – with those names.  Never heard of
            that name.  Never heard that name.
21          A:  No.
            Q:  Ever heard of LGC – Little Gangster name –
22          A:  Crip.
            Q:  So little Asian?
23          A:  Yeah.
            Q:  By someone – I don't –
24          A:  Yeah.
            Q:  You're familiar with that gang?
25          A:  I have heard antidotal things about them, yes.
            Q:  Okay.  And are you familiar with the Crips?
26          A:  No so – crimes.  We deal more narcotic zone – problem in my

                                          29

1   area, and then we have the MOD's – or one of the gangs that I've
    had to run off.
2   Q:  Masters of Destruction?
    A:  Yeah.
3   Q:  All right.  Well, you know – and – and you heard me talk to
    Mr. Babcock to some extent about this.  [¶]  You know, based on
4   your knowledge of gangs, is that – is that cause you to form any
    strong opinion that might – that might lead you to be unbiased or
5   partial towards either prosecution or defense in this case?
    A:  Honestly not, your Honor.  Because that's just a part of life
6   down there.  [¶]  And, um, you know, they're kids.  And, you
    know, that's – just happens to them.  So it's very unfortunate.  But,
7   you know, it's just part of the stuff down there.
    Q:  Now, once again, you – you may hear testimony in this case
8   about – you may hear experts testify about gangs.  You may
    actually hear gang members themselves testify about some aspects
9   of the gangs.  [¶]  Now, if you – if you were to serve on this jury,
    can you set aside your own knowledge and what you've learned
10  about gangs and judge this case based solely on the evidence
    presented and the law that I give you?
11  A:  Yes.
    Q:  All right.  And last question along – along those lines.  [¶]  Do
12  you think that given everything you know and your background as
    a teacher, the things that you've learned, you know, about the gang
13  and the area of your school, do you feel – you think that you can be
    fair, impartial to both the defense and the prosecution in this case?
14  A:  I believe I can –
    Q:  All right.
15  A:  – your Honor.

16  (Id. at p. 838-40.)

17      Petitioner argues that the above colloquies between these two empaneled jurors illustrate

18  that they each had similar attributes and knowledge of gangs such that comparative juror analysis

19  establishes a finding of pretext with respect to the strike against Irene M.  While both juror

20  numbers 7 and 11 indicated during the proceedings some knowledge of gangs, it does not follow

21  that they were similar to Irene M.  The reason for the strike against Irene M. was her demeanor.

22  The record does not indicate that Jurors 7 and 11 possessed this same demeanor with respect to

23  gang members.  Therefore, Petitioner has not shown that the prosecutor's reason for striking

24  Irene M. based on her demeanor was pretextual.

25          iv.  Amber D.

26      Next, Petitioner argues that the prosecutor's strike against Amber D. was unconstitutional

30

because it was based on the fact that she was Hispanic.  (See Pet'r's Pet. at p. 24 & Voir Dire Tr.
at p. 809.)  The trial court found that Petitioner had satisfied his prima facie case with respect to
the strike against Amber D.  (See id. at p. 813.)   The prosecutor then stated the reasons for
striking Amber D. which were the following:

> [Amber D.], this is the individual who I have – one, she – there is a
> nephew that is doing 25 years to life for a murder charge.  So this
> is an individual who knows the penalty for murder.  [¶]  And also
> regarding the sister-in-law, I do have a big note that there was a
> self-defense issue in which a relative or someone, I can't remember
> the – I have the big self-defense issue highlighted.  [¶]  It's my –
> it's my belief or at least a thought that we're going to hear some
> self-defense issues in this case.  And I wasn't going to keep a juror
> who had those ties, plus a nephew who's doing 25 to life for
> murder.

(Id. at p. 814.)  The trial court found that the prosecutor had established that these were the actual
reasons for striking Amber D.  (See id. at p. 817.)  The California Court of Appeal agreed.

       During the voir dire proceedings the following colloquies took place between Amber D.
and the court:

> Q:  All right.  Now, someone in your family was arrested for a
> crime.  It's your nephew?
> A:  Yes.
> Q:  Is that something you want to discuss in private?
> A:  Yes.
> Q:  Is that what you wanted to discuss in private?
> A:  Yes.
> Q:  Okay.  All right.  And your sister-in-law was a witness to a
> crime?
> A:  Yeah, not that one but another one.  Yes.
> Q:  Okay.  What did she witness?
> A:  Murder.
> Q:  Oh, she did?
> A:  Yes.
> Q:  Was that here in Sacramento County?
> A:  Yes.
> Q:  How long ago was that?
> A:  I'm gonna say eight or nine years ago.
> Q:  Okay.  Was she ever called to testify?
> A:  No.  The charges were dropped.  It was self-defense.
> Q:  Okay.  Well, let me ask you this question.  [¶]  Did you talk to
> her about the incident that she witnessed?
> A:  No.

1    Q:  How did you find out about it?
    A:  My mother-in-law.
2    Q:  Oh, she actually told you about the incident?
    A:  Yes.
3    Q:  Oh, okay.  So you kind of heard it secondhand?
    A:  Yes.
4    Q:  All right.  And in at least in your mother's description of that
    incident, do you think that would have any impact upon your
5    ability to be fair and impartial in this case?
    A:  No.
6    Q:  All right.  And truly, do you think of yourself as being an open
    mind (sic)?
7    A:  Yes.
    A:  Do you work well with others?
8    Q:  Absolutely.
    Q:  All right.  Great.  [¶]  And you know, the incident where your
9    sister-in-law was a witness, you said that was here in Sacramento
    County?
10    A:  Yes.
    Q:  Charges were dropped you said?
11    A:  Yes.  It was her son who committed the crime.
    Q:  Okay.
12    A:  And it was a – a spousal abuse type thing and her son shot the
    father.
13    Q:  Oh, I see.
    A:  Yeah.
14    Q:  I see.  [¶]  Okay.  Was that the thing you wanted to talk about
    in private?
15    A:  No.
    Q:  Is there – okay –
16    A:  It was –
    Q:  We'll talk about the private thing.  I don't want you to get to
17    blurt that out when you indicated you wanted to discuss that in
    private.  We'll reserve about – talking about that until the
18    appropriate break and we'll talk about it then.
    Q:  All right.  Well, is there anything about the – the incident
19    involving your sister-in-law where she witnessed this – this self-
    defense that would impact your ability to be fair and impartial in
20    this case?
    A:  No.
21    Q:  All right.  And can you set that aside and judge this case based
    solely on the evidence presented –
22    A:  Absolutely.
    Q:  – and the law that I give to you?
23    A:  Yes.

24  (Voir Dire Tr. at p. 613-16.)

25       The following colloquy took place between the court and Amber D. outside the presence

26  of the other prospective jurors:

32

Q:  Ma'am, you indicated there was something you wished to discuss with us in private?

A:  Well, it was just the second – there's two murder things on there.  And the second one is – it's my nephew.  And he is currently serving now 25 years to life or something like that.

Q:  Yeah.  It says –

A:  There were two.

Q:  I was confined – confused.  Your nephew by marriage was convicted of murder but never charged?

A:  That's the one that said it was a spousal abuse thing.

Q:  I see.

A:  That way – and they never charged him.  They said it was in self-defense because he was – he was protecting his mother.

Q:  Okay.

A:  So that one was – that one was dismissed but the other nephew, same family.

Q:  Oh, his brother?

A:  Yes.  And that was – he was committing a robbery –

Q:  Okay.

A:  – drug related robbery.  And him and two other people I guess, and, um he – he murdered somebody –

Q:  Okay.

A:  – during the process.

Q:  Did you follow the case?

A:  No.  I just heard about it through my mother-in-law, 'cuz it's my husband's side of the family.  I really didn't – I just heard some things about –

Q:  At least insofar as what you heard from your mother-in-law, okay, were you satisfied with the manner in which your nephew was treated during his involvement or his arrest with law enforcement?

A:  Yeah.  Like I said, I don't really know much about it so I don't know how he was treated or what really went on.

Q:  But you know he was convicted of murder?

A:  Yes.

Q:  Now, did you – did you hear whether or not there were any allegations of any type of gang involvement?

A:  No.

Q:  Were there?  Was there?

A:  There weren't any, no.

Q:  Okay.

A:  Now – see, I don't know – there weren't that I know of.  All I heard was that, you know, he did this thing and –

A:  Okay.

A:  – and he had to go to court and –

Q:  Well, at least to your knowledge, what type of weapon, if any, was used during that – that – that case?

A:  I don't even know that.  I just know that there was one used.

Q:  You don't know if it was a gun, a knife?

A:  No.  It was a gun.

Q:  Oh, okay.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

A:  Yeah.
Q:  Okay.
A:  It was a gun.
Q:  And do you know the circumstances surrounding the use of the
weapon?
A:  No, I don't.
Q:  You just know it was during the robbery?
A:  Yes.
Q:  All right.  Well, is there anything about that incident that might
impact your ability to be fair and impartial?
A:  No.
Q:  Obviously, you wanted to speak about it in private?
A:  Yeah.
Q:  And that's your right.  I mean, you can do that.  That's totally
find. [sic]  [¶]  But all we need to know is whether or not, you
know, because this is a murder case.
A:  Right.
Q:  Your nephew was convicted of murder.  And we just need to
know whether or not it's something that hits too close to home to
you such that you'll bring in that experience and draw upon that
experience as you attempt to decide what happened in this case?
A:  Um, I didn't really have any experience.
Q:  Okay.
A:  That's –
Q:  All right.  So if you're selected to serve as a juror in this case,
can you set both of those incidents aside, both incidents involving
your nephews, and judge this case based solely on the evidence
presented and the law that I give to you?
A:  Yes.
Q:  Are you certain of that?
A:  Yes.

17

18

(Voir Dire Tr. at p. 649-52.)  Next, the following colloquy took place between Petitioner's trial

counsel and Amber D.:

19

20

21

22

23

24

25

26

Q:  The nephew that's serving time, I believe you said 25 to life?
A:  Yes.
Q:  All right.  Have you ever visited him in prison?
A:  No.
Q:  Okay.  And if the Court – I think the Court would instruct you,
you're not to say anything about his sentence or you know the time
or anything like that if you're selected as a juror.  [¶]  Do you
understand that?
A:  No.  I'm sorry.  I don't understand what you said.
Q:  It wasn't a very clear question.  [¶]  If – but if you're selected
as a juror in the case –
A:  Yes.
Q:  – and you're in deliberations and someone somehow or another
says something about penalty or punishment –
A:  Yeah.

34

1    Q:  – and, you know, because your nephew is convicted of murder
       –
2    A:  Yes.
     Q:  – and he got 25 to life, you can't say anything about that the
3    fact he got 25 to life.
     A:  Oh, that's fine.
4

5    (Id. at p. 653.)  Finally, the following colloquy took place between the prosecutor and Amber D.:

6    Q:  Question about the other nephew, the one that was never
     charged.  [¶]  What were the circumstances of that?
7    A:  All I remember is that they were – at first, I think it was the
     District Attorney's Office that decided, and they just told me – my
8    in-laws had said that they – the District Attorney was still trying to
     decide – you know, looking at the facts, whether they should
9    charge him with anything.  [¶]  And and I believe that they came to
     – after looking at all the facts, they believed that there was not
10   enough evidence to charge him with anything so it was just self-
     defense.
11   Q:  Okay.  So the District Attorney's Office looked at all the
     evidence and because of – it was they determined it was self -
12   defense –
     A:  Yes.
13   Q:  – that they didn't charge your nephew?
     A:  That's correct.
14   Q:  Okay.  What were the circumstances of the incident.  It had to
     do with a domestic violence?
15   A:  I believe – again, I can't – we – we – let's see.  My sister-in-
     law had – they're kind of – we weren't really from the – we
16   weren't around them a lot.  [¶]  And her new husband was I believe
     doing drugs, and so he would be violent towards her.  And this I
17   guess had been an ongoing thing for awhile.  And the boys being in
     the home would see this.  [¶]  And after a while I guess it got to be
18   too much and he was actually biting [sic] her up very badly in the
     kitchen I believe.  And he came in and saw this and – my nephew.
19   And went and got a gun, came back and confronted him with it.
     And the guy, being on drugs I guess, was very violent towards him,
20   too.  And then that's when he was shot.
     Q:  Okay.
21   A:  Something like that.
     Q:  So he actually interceded?
22   A:  Yes.
     Q:  In the middle –
23   A:  Yes.
     Q:  – of him beating –
24   A:  Yes.
     Q:  – his mother?
25   A:  Yes.  Yes.
     Q:  Went and got a gun?
26   A:  Yes.

35

1   Q:  And came back sand [sic] essentially defended his mother?
    A:  Yes.
2   Q:  What – was being beaten?
    A:  That's correct.
3   Q:  And this had been an ongoing thing?
    A:  Yes.
4   Q:  Okay.
    A:  Yeah.
5

6   (Id. at p. 654-56.)

7          Petitioner argues that the reasons given by the prosecutor for striking Amber D. were

8   pretextual which establishes his Baston claim.  Petitioner asserts that comparative juror analysis

9   supports a finding of pretext with respect to this strike.  He specifically cites to three other jurors

10  who testified to legal proceedings in which either they or people that they knew were involved in.

11  One empaneled juror had two DUIs, another had a dishonorable discharge from the military for

12  marijuana use and the third had a friend who was murdered.  With respect to the first two

13  empaneled jurors cited by Petitioner, DUIs and marijuana use are quite different than murder.

14  Thus, these two jurors are not similar to the fact that Amber D. had a nephew who was in prison

15  for murder.  With respect to the third empaneled juror cited by the Petitioner, as noted by the

16  California Court of Appeal, knowing a murderer is different than knowing someone who was

17  murdered.  Thus, that empaneled juror did not compare to Amber D.'s knowledge of a nephew

18  who was in prison for murder.  Additionally, the record does not indicate that other jurors knew

19  the penalty for murder.

20          Petitioner also argues that the prosecutor's argument that he was worried about Amber

21  D.'s knowledge of the self-defense issue was pretextual.  Specifically, he argues that Amber D.'s

22  "experience with the self-defense issue was a fact that, as a matter of simple logic, would have

23  cut in favor of the prosecution." (Pet'r's Pet. at p. 25.)  In support of this argument, Petitioner

24  cites to Ali v. Hickman, 571 F.3d 902 (9th Cir. 2009), amended and superceded by, 584 F.3d

25  1174 (9th Cir. 2009), cert. denied, Cate v. Ali, 130 S.Ct. 2065 (2010).  In Ali, the Ninth Circuit

26  found that the prosecutor's assertion that he struck a potential juror because she hesitated about

                                          36

the affect of her daughter's molestation was unpersuasive because, "any bias on [the potential juror's] part logically would logically favor the prosecution, not the defense . . . In this case, the victim . . . was, like [the potential juror's] daughter, a young woman and the victim of a domestic assault." Ali, 584 F.3d at 1184.

Petitioner's case is unlike Ali.  Unlike the prospective juror in Ali, Amber D.'s nephew was similar to what Petitioner was asserting regarding self-defense rather then being a juror that would be more sympathetic to the prosecution as was the case in Ali.  Thus, the prosecutor's "self-defense" rationale for striking Amber D. also was not implausible or contradicted by the record.

For the foregoing reasons, Petitioner has failed to show that the prosecutor's reasons for striking Amber D. were pretextual.  Therefore, he is not entitled to federal habeas relief on his argument that Amber D. was unconstitutionally struck as a juror based on her Hispanic race.

v. Wanda S.

Next, Petitioner argues that the prosecutor impermissibly struck Wanda S. because she was Asian.  The trial court found that Petitioner had satisfied his prima facie case with respect to the peremptory strike used against Wanda S.  The prosecutor then gave his reasons for striking her which were the following:

> And as for [Wanda S.], this was a woman who knows [Petitioner's counsel] from her church, as well as an [sic] indicated that the defendants looked familiar.  That she doesn't know where they looked familiar from, but that she or know they didn't look familiar.  I think it was that a number of names were familiar to her.  [¶]  So I was not gonna wait and see mid-trial when it came to her or she ended up recognizing somebody, how those chips had to fall, so she was excused.

(Voir Dire Tr. at p. 814-15.)  The trial court found these reasons to be the actual motivations for the strike.  (See id. at p. 817.)  The California Court of Appeal agreed and declined to reverse the trial court's decision.  That decision was not an objectively unreasonable application of clearly established federal law.  Wanda S. admitted that she knew Petitioner's trial counsel from church.

1    Additionally, it is worth noting that the empaneled jury apparently included an Asian.  (See Voir

2    Dire Tr. at p. 1041.)  While this is not a dispositive factor, it is further indicia that the

3    prosecutor's strike against an Asian was not pretextual.  See Turner v. Marshall, 121 F.3d 1248,

4    1254 (9th Cir. 1997) (noting that the fact that the prosecutor accepted blacks on the jury may be

5    considered indicative of a nondiscriminatory motive but it is not dispositive).

6            Petitioner argues that comparative juror analysis supports a finding of pretext with

7    reference to Wanda S.  In support of his argument, he asserts that Juror No. 7 was similar to

8    Wanda S. but was not struck by the prosecutor.  During the voir dire, Wanda S. testified that she

9    knew one of the attorneys from church.  (See Voir Dire Tr. at p. 663.)  She also testified that she

10   kept on looking at the defendants and that they looked familiar.  (See id. at p. 661.)  In support of

11   his comparative juror analysis, Petitioner asserts that Juror No. 7 testified that there was a chance

12   that she taught some of the witnesses named.  While Wanda S. also testified that there was a

13   chance that she taught some of the witnesses named, this does not establish that Petitioner is

14   entitled to federal habeas relief.  Juror No. 7 did not know any of the attorneys in the case (unlike

15   Wanda S.), and did not testify that the defendants looked "familiar" (unlike Wanda S. who

16   testified that the defendants looked familiar).  Additionally, it is worth reiterating that there was

17   at least one Asian who sat on the jury, which, while not dispositive, is indicative evidence of

18   non-discrimination.  See Turner, 121 F.3d at 1254.  For the foregoing reasons, Petitioner failed to

19   show that the prosecutor's strike against Wanda S. was unconstitutional.

20                   vi.  Clem C.

21          Next, Petitioner argues that the prosecutor's strike against Clem C. was unconstitutional

22   because it was based on Clem C.'s Asian race.  The trial court determined that Petitioner had

23   satisfied his prima facie case with respect to the strike against Clem C.  The prosecutor then

24   stated the reasons for the strike:

25              [Clem C.] had been prosecuted by the Sacramento County District
                Attorney's Office in a scenario where he felt he was not guilty.  He
26              went to jury trial.  [¶]  And in what he said he was looked at the

                                        38

1   jurors and thought that they were wanting to go home at 4:00 kind
    of jury, so he just pled guilty regardless of the fact that he felt that
2   he was not guilty.  He clearly was not going to be a juror either.

3   (Voir Dire Tr. at p. 814.)

4         The trial court found that the reasons given by the prosecutor appeared to be the actual

5   reasons for the strike and denied Petitioner's <u>Batson</u> argument with respect to Clem C.  The

6   California Court of Appeal agreed in denying this argument on direct appeal.  During the voir

7   dire proceedings the following colloquy took place between the prosecutor and Clem C.:

8               Q:  And there's also a concealed weapon –
                A:  Yes.
9               Q:  – without a permit?  [¶]  Can you tell us about that?
                A:  Um, that was a citation for me.  As I said, I travel a lot as a
10              federal auditor.  [¶]  And my uncle had given me this Daringer
                two-shot pistol years ago.  And as my son was getting, he was a
11              toddler by, you know, 1977, three years old.  I remember looking
                in my closet and I thought oh, I don't want to leave that around.
12              He might climb up, and it was not loaded or anything.
                A:  Uh-huh.
13              A:  So I decided to store it in a garment – old garment bag within
                the pocket and just put it in the back of my closet.  And I forgot
14              about it.  And as I was –
                Q:  I can see where this is going.
15              A:  As I was going through the metal detector, I was on government
                orders to go to Phoenix, Arizona.  As I was going through the
16              metal detector, they asked me do you have a toy gun in your
                garment bag?  I don't remember packing anything like that.  So –
17              so I looked and said – and I said yes, that's my mine. [sic]  It's not
                a toy.  I remembered what happened.
18              Q:  All right.  Did you actually – well, what happened with that
                ultimately?  What was the end result?
19              A:  Okay.  My brother-in-law who was – he was not with the
                District Attorney's Office.  He offered to legal counsel for me, and
20              it was going to go through trial.  [¶]  And I thought about it.  And I
                thought at the time I would – might lose in trial.  And I looked at
21              the respective jurors that half, the selection.  And I thought they
                might know being – know the intent that I had and the like 4
22              o'clock, I wanted to go home on Friday type group.  So my
                brother-in-law he was pretty candid and I pled no contest.
23              Q:  Okay.
                A:  And then I was – didn't – had to complete a Western
24              Corrections.
                Q:  Right.
25              A:  And did that successfully.
                Q:  How did that – did that leave you with kind of a bad taste in
26              your mouth for the system?  You kind of feel like you were – you

                                        39

1    know, you shouldn't have been in a situation probably where you
     had to plead to that?
2    A:  I felt sort of ridiculous.  It was ridiculous because I forgot.  I
     knew the facts that I had tried to – I had to put my garment bag on
3    where it was found.  [¶]  So it seems pretty straightforward to me
     that it was just the intent.  I'm not sure if I had to prove intent, that
4    I had an intent or not.  But I thought that it was kind of fair way.  I
     made my decision.
5
6    (Id. at p. 703-04.)

7            As the above colloquy illustrates, the prosecutor's reason for striking Clem C. as to his

8    feeling with respect to the prospective jury in his case was plausible and supported by the record.

9    Petitioner fails to show that the state court's decision was an unreasonable application of clearly

10   established federal law.  He does not show that empaneled jurors had similar experiences against

11   juries.  Furthermore, as previously noted, at least one empaneled juror was apparently Asian.

12   While not dispositive, that is further evidence indicative of non-discrimination.  See Turner, 121

13   F.3d at 1254.  Petitioner fails to show that the prosecutor's reason for striking Clem C. was

14   pretextual.

15                        vii.  Gilda B.

16           Next, Petitioner argues that the prosecutor impermissibly struck a Hispanic prospective

17   juror, Gilda B., on account of her race.  The trial court determined that Petitioner had satisfied his

18   prima facie case with respect to this strike.  (See Voir Dire Tr. at p. 1039.)  The prosecutor then

19   gave his reasons for striking Gilda B.:

20                   Now, in terms of [Gilda B.], she indicated a number of individuals
                 who had some contact with the criminal justice system.
21               Now some of it, her daughter, two years ago had a DUI.  And there
                 are a lot of people that had DUIs.  And I don't think that's much of
22               an issue.
                 But she did indicate that her brother-in-law had some extremely
23               serious run-ins with the law, including armed robbery of ATM's
                 that occurred just three years ago.
24               In addition to that drugs and robbery, and I believe that she
                 indicated that the robbery was separate from the armed robbery of
25               the ATM's.  All of that occurred in Sacramento County.  All of
                 that occurred and was prosecuted by the Sacramento District
26               Attorney's Office.

                                          40

1
      She actually attended court proceedings in that case.  She said that
      she actually attended the judgment and sentencing in that – in at
2
      least one of those cases.
      And given the seriousness of those offenses and the – I mean, this
3
      is not a DUI we're talking about.  These are armed robberies of
      ATM's.  And that was just three years ago.
4
      And I am – and that was prosecuted by the Sacramento County
      District Attorney's Office.  I'm simply not comfortable with that
5
      individual on my jury regardless what have she says.
      And that – and obviously if she said she couldn't be fair, we'd be
6
      talking about a cause challenge.  But she didn't and I wasn't going
      to press the issue and ask more questions about those situations.  I
7
      was just – happy just to use a peremptory challenge and remove her
      from the panel.

8

9
(Voir Dire Tr. at p. 1044-45.)  In responding to the prosecutor's reasons with respect to Gilda B.,

10
the trial court stated the following:

11
      If you look at [Gilda B.], for example, we questioned her
      extensively on – on issues that were raised in her questionnaire,
12
      and then she subsequently had it on her questionnaire that she
      wished to take up matters in private.  And then we have proceeded
13
      to question her in private concerning – concerning those matters.
      So, you know, it's not as though we've sort of done a cursory or
14
      limited questioning of these jurors.  We've done an – extensively
      with [Gilda B.] based on some of these . . . responses.
15
      And, um, you know, I will say this.  I don't find that the
      prosecution's reasoning at least as far as [Gilda B.] is concerned,
16
      and – and that seems to be the thrust of – of the – of the challenges
      here.
17
      I don't find that the reasons given by the prosecution were trivial.  I
      think those are significant reasons.  Here you have an individual
18
      who arguably has a family member involved in a criminal justice
      system for some very, very serious.
19
      Offense so to the extent that those – the reasons that Mr. – that Mr.
      Soloman gave are certainly genuine reasons.  And I think those will
20
      suffice to – to prevent the – the current – the current – um, the
      current challenges.
21
      And I also find that the – the reasons he's given, they certainly are
      supported by her answers by – by the record.
22
      Now, granted he was mistaken as to the dates.  I know – I – I show
      in my notes that she said the robberies was a string of ATM
23
      robberies.  And then she did mention another robbery.  But she did
      indicate they were 15 years ago this – that he had been in prison
24
      because she started counting on her fingers.  And she said just got
      out of prison three years ago.
25
      But she did say she attended some of the court proceedings.  And –
      and – and I think the concern expressed by Mr. Soloman based on
26
      her – her answers is a legitimate concern, and those concerns

1    appear to be the actual motivation for the exercise of the challenge.

2    (Id. at p. 1053-55.)  The California Court of Appeal also noted the prosecutor's mistake in stating

3    that Gilda B.'s brother-in-law's armed robbery occurred three years ago when it actually occurred

4    fifteen years ago.  Yet, it determined that the trial court viewed this simply as a mistake by the

5    prosecutor and that the prosecutor did not place great emphasis on the fact that the armed robbery

6    occurred fifteen rather than three years ago.  Ultimately, it determined that the fact that Gilda B.'s

7    brother-in-law was convicted of armed robberies established that the trial court's decision was

8    not reversible error.

9         The following colloquy took place between the trial court and Gilda B. during the voir

10   dire proceedings:

11              Q:  You had several matters you wished to tame [sic] take up in
                private?
12              A: Yes.
                Q:  And someone had a DUI, drugs and robbery.  [¶]  Was that the
13              same person?
                A: No.
14              Q:  Who?
                A:  Separate.
15              Q:  Who were these people?
                A:  My daughter was the DUI.  She had it about two years ago.
16              Q:  Okay.
                A:  And then my brother-in-law was the one the robbery.  Did I say
17              drugs, too?
                Q:  Yes.
18              A:  Okay.  Him, too.  Brother-in-law.
                Q:  All right.  And both those cases with your daughter and your
19              brother, you said your brother-in-law?
                A:  Yeah.  Brother-in-law.
20              Q:  Were those here in Sacramento County?
                A:  Yes.
21              Q:  And how were they treated by law enforcement during the
                arrests?
22              A:  I don't know.
                Q:  Okay.  Well, is there anything about the arrest that would cause
23              you to be biased or partial towards either the defense or the
                prosecution?
24              A:  No.
                Q:  All right.  Now, did you follow the court cases in your
25              daughter's case or in your brother-in-law's case?
                A:  I only went to my brother-in-law's the last day, but I didn't
26              follow anything.  Just to hear the hearing – I mean, the day of the

42

1    sentence was the only day that I was in the court.
     Q:  Okay.
2    A:  That was – that was the only time I ever went.
     Q:  Okay.  And so I'm assuming he was prosecuted by the D.A.'s
3    Office?
     A:  Yes.
4    Q:  Do you hold any anomosity [sic] against the D.A.'s Office for
     prosecuting him?
5    A:  No.
     Q:  And conversely, do you have any issues with his attorney such
6    that you might have a tendency to take it out on these attorneys in
     this case?
7    A:  No.
     Q:  And you can be fair to both sides?
8    A:  Yes.
     Q:  All right.  And same questions with the DUI.  Any of your
9    responses would be different?
     A:  The same.
10

11   (Id. at p. 991-93.)  Subsequently, the following colloquy took place between the prosecutor and

12   Gilda B. during the voir dire proceedings:

13           Q:  The arrest of your brother-in-law, how long ago was that?
             A:  I'm gonna say 15 years ago.
14           Q:  Oh, okay.  And is this your husband's brother?
             A:  Yes.
15           Q:  Okay.  And were you married at the time?
             A:  Yes.
16           Q:  And the drugs, what type of drug charges?
             A:  Heroin.
17           Q:  Okay.  Were these separate, one time?  One was for drugs, one
             time was for robbery?
18           A:  I think it was altogether at the same.
             Q:  Okay.
19           A:  Like I said, I didn't pay – I didn't really follow it really good.  I
             just know that that's what part of it was.
20           Q:  Were you fairly close to him?
             A:  I'm close to him, but didn't – I guess I wasn't.  I should have.
21           If it was my brother, I probably would have followed it but –
             Q:  Okay.  Do you know what robbery involved?
22           A:  He – armed robbery, ATM's.  And I don't know where or how
             many.  I don't know.
23           Q:  Okay.  And you just went to the sentencing?
             A:  Yes.  For – for to help out my mother-in-law.
24           Q:  Okay.
             A:  You know, support.
25           Q:  Is he incarcerated now?
             A:  No.  He got released three years ago.
26

(Id. at p. 993-94.)

Petitioner argues that the prosecutor's reliance on Gilda B.'s brother-in-law's conviction and sentence in striking her was pretextual.  In support of his argument, Petitioner argues that:  (1) the prosecutor misstated when Gilda B.'s brother-in-law robbery crime occurred; (2) the California Court of Appeal erred when it stated that the prosecutor did not place great emphasis on the timing of the brother-in-law's conviction; (3) the fact that the California Court of Appeal found that the failure of the prosecutor to engage in further questioning of Gilda B. as irrelevant was in error; and (4) comparative juror analysis supports a finding of pretext.  Each of these arguments are considered in turn.

A prosecutor's exercise of a peremptory challenge based on an honest mistake, rather than a discriminatory purpose may not violate a defendant's equal protection rights.  See Aghazadeh v. Evans, Civ. No. 07-1814, 2009 WL 2365670, at *6 (C.D. Cal. July 29, 2009) (citing United States v. Watford, 468 F.3d 891, 914-15 (6th Cir. 2006); People v. Williams, 16 Cal. 4th 153, 188-90, 66 Cal. Rptr. 2d 123, 940 P.2d 710 (1997)).  What matters in a Batson analysis is the actual reason for the challenge.  See Johnson, 545 U.S. at 172.  The state court was in the best situation to determine whether the prosecutor's misstatement about the date of Gilda B.'s brother-in-law's crimes was an honest mistake rather than an intentional misrepresentation.  The best evidence of discriminatory intent is the prosecutor's demeanor and the trial court was in the best situation to judge the prosecutor's credibility.  See, e.g., Snyder, 552 U.S. at 477.  The fact that the state court determined that the prosecutor made an honest mistake about the dates does not establish that the prosecutor's reasons for striking Gilda B. were pretextual.

Next, Petitioner argues that the California Court of Appeal erred when it found that the prosecutor did not place great emphasis on the timing of Gilda B.'s brother-in-law's conviction. In support of his position, Petitioner notes that the prosecutor twice cited to the fact that the robberies occurred three years ago in explaining to the trial court his reasons for striking Gilda B. As noted above, the state court determined that the prosecutor recollection regarding the timing

1  of Gilda B.'s brother in law's crimes was an honest mistake.  The fact that the prosecutor stated

2  two times that the crimes took place three years rather than fifteen years ago does not mean that

3  Petitioner has satisfied his burden to show pretext.  The state court was in the best situation to

4  judge the prosecutor's credibility.

5       Petitioner also argues that the prosecutor's reason for striking Gilda B. was pretextual

6  because he had a duty to do more in-depth probing into her potential bias before striking her.

7  First, the prosecutor did question Gilda B. about her brother-in-law's robbery conviction as cited

8  above.  Furthermore, the courts have determined that the fact that a prospective juror had a

9  relative who was arrested and incarcerated has been recognized as a plausible, race-neutral basis

10  for exercising a peremptory challenge.  See, e.g., United States v. Vaccaro, 816 F.2d 443, 457

11  (9th Cir. 1987), overruled on other grounds, Huddleston v. United States, 485 U.S. 681 (1988);

12  see also, Messiah v. Duncan, 435 F.3d 186, 201 (2d Cir. 2006) (prosecutor could have reasonably

13  believed that panelist who had relatives in prison might be sympathetic to defendant); United

14  States v. Wiggins, 104 F.3d 174, 176 (8th Cir. 1997) ("the incarceration of a close family

15  member is a legitimate race-neutral reason justifying the use of a peremptory strike") (internal

16  quotation marks and citation omitted).  Having determined that Gilda B. had a family member

17  who was arrested and imprisoned for robbery, no further inquiry was required by the prosecutor.

18  Petitioner's citation to United States v. Esparaza-Gonzalez, 422 F.3d 897 (9th Cir. 2005) is

19  unavailing under these facts.  In Esparaza-Gonzalez, 422 F.3d at 905, the Ninth Circuit noted that

20  the prosecutor struck two Hispanic jurors "after waiving his opportunity to pose *any* direct

21  questions to the venire panel contributes to an overall inference of discriminatory intent."  Unlike

22  Esparaza-Gonzalez, the prosecutor in Petitioner's case engaged in a colloquy with Gilda B.

23  which inquired about her brother-in-law's conviction.  The prosecutor then struck Gilda B. based

24  on her brother-in-law's circumstances, which was a race-neutral reason for the strike.  Esparaza-

25  Gonzalez is distinguishable.

26       Finally, Petitioner argues that comparative juror analysis illustrates that the reasons the

1    prosecutor gave for striking Gilda B. were pretextual.  In support of his argument, Petitioner

2    argues that the prosecutor did not strike juror number 3.    The following colloquy took place

3    between the court and juror number 3 during voir dire:

4              Q:  Now, someone was arrested for civil crimes.  It says drug
               possession, weapons and illegal hunting?  [¶]  Who was that?
5              A:  My brother-in-law.
               Q:  All three?
6              A:  Yes.
               Q:  Was it the same occasion or –
7              A:  I believe so.  I believe when he was arrested he was poaching
               deer, and I believe they found a weapon in his vehicle and then a
8              crossbow.  And then there was drugs that they also found on in the
               search.  [¶]  And then I didn't mention on there then after I think he
9              was out on probation or on bail, and then I think he got arrested
               again for assault.  And then when he was arrested, then he had a
10             knife on him I believe.
               Q:  Okay.  Now, who arrested him initially?  It was the park police
11             the rangers or –
               A:  It was actually Pacific Grove Police Department.
12             Q:  Oh, okay.
               A:  Yeah.
13             Q:  All right.  And, um, how long did that occur?
               A:  I'd say just probably maybe four years – four or five years ago
14             maybe.
               Q:  And how did you follow the case?  Parents?  Family members
15             or did you talk to him?
               A:  Just through my wife.
16             Q:  All right.
               A:  Yeah.
17             Q:  And is there anything about that incident that might impact
               your ability to be foil? [sic]
18             A:  No.
               Q:  All right.
19

20   (Voir Dire Tr. at p. 747-48.)

21          Comparative juror analysis is a "tool" a court uses for exploring the possibility that

22   facially-neutral reasons are pretext for discrimination.  See Lewis, 321 F.3d at 830.  A state

23   court's finding that a prosecutor has not exhibited discriminatory intent in exercising peremptory

24   challenges "represents a finding of fact of the sort accorded a great degree of deference."

25    Hernandez, 500 U.S. at 364.

26          Petitioner argues that Gilda B.'s brother-in-laws charges were comparable to juror

46

number 3's brother-in-law's arrests.  However, Petitioner fails to meet his burden to show pretext

based on comparable juror analysis.  The prosecutor engaged in an extensive colloquy with Gilda

B. regarding her brother-in-law's charges as detailed above.  Thus, Petitioner's citation to

Esparza-Gonzalez, 422 F.3d 897 is again unavailing.  In Esparza-Gonzalez, 422 F.3d at 904-05,

the Ninth Circuit noted that the prosecutor's failure to pose any questions to the venire panel

contributed to an overall inference of discriminatory intent.  Here, as previously noted, the

prosecutor engaged in extensive questioning of the prospective minority juror Gilda B.

Furthermore, the prosecutor stated that he was not comfortable with the fact that Gilda B.'s

brother-in-law was prosecuted by the Sacramento District Attorney's Office, the same office that

would be prosecuting Petitioner.  (See Voir Dire Tr. at p. 1045 ("And I am – and that [Gilda B.'s

brother-in-law's armed robberies] was prosecuted by the Sacramento County District Attorney's

Office.  I'm simply not comfortable with that individual on my jury regardless what have she

says.").) .)  Comparatively, juror number 3's brother-in-law's arrest for the deer poaching incident

took place in Pacific Grove.  Finally, the prosecutor stated on the record that Gilda B. attended

the sentencing in her brother-in-law's case.  Juror number 3 only followed his brother-in-law's

case through his wife.  For the foregoing reasons, Petitioner failed to show that the prosecutor's

reasons for striking Gilda B. were pretextual based on comparable juror analysis.  Therefore,

Petitioner is not entitled to federal habeas relief based on the peremptory strike used against

Gilda B.

                      viii.  Ms. M.

      Finally, Petitioner argues that the prosecutor impermissibly struck Ms. M because she

was African-American.  The trial court determined that Petitioner had satisfied his prima facie

case with respect to the strike against Ms. M.  The prosecutor then gave his reasons for striking

her which were the following:

> As to [Ms. M.], [Ms. M.] indicated that she's a counselor at
> Consumnes River College.  I would note that my understanding of
> the evidence is that at least Bruce Phan at the time of this offense

1
    was attending Consumnes River College.

    In addition to that, her counseling she indicated dealt with not just
2
    career counseling but actually dealing with problems of individuals
    and – and trying to work through disputes between individuals.
3
    She also indicated that she worked at a high school in South
    Central L.A.  And had ex – numerous, numerous contacts with
4
    gang members in South Central L.A.

    She indicated that her role as a counselor, as an advocate for those
5
    students versus professors typically.  She had students that had
    been murdered as well as committed murders and robberies.
6
    And in addition to all of that, this was also the juror who came in
    and said on Tuesday and Thursday she wanted to be out of here at
7
    4:15 because she needed to get to her class.

    And I will note for the record that when the Court told her that we
8
    are not going to break at 4:15 everyday to accommodate her
    schedule, her reaction – I think the Court said do you understand
9
    that?  She tilted her glasses down and essentially stared at your
    Honor for I would say at least five seconds of just staring at the
10
    Court.

    I don't have a lot of confidence that she is not someone who's
11
    going to be little bit hostile because of the fact that we placed her
    in this situation.
12
    The Court has now told her that we are not accommodating her
    schedule and she's just out of luck.  That combined with the – the
13
    large number of contacts that she had in South Central L.A. with
    gang members makes her – I could have questioned her for three
14
    hours solid and still not figured out where she was going to come
    down on that issue.  And that's just that's a wild card that I'm – I
15
    just would not accept on this jury.

16
(Voir Dire Tr. at p. 1045-46.)  The trial court then stated the following in assessing the validity of

17
these reasons:

18
    Now as to [Ms. M.], I think it's – it's somewhat of an easier call
    given her association with – her extensive association with
19
    gang.  [¶]  Given the fact that as Mr. Soloman pointed out, she's a
    counselor.  And I think his reasons for excusing her from this jury
20
    are group – neutral and they are plausible – plausible reasons.  And
    they are certainly supported by the – by the record.
21
    And lastly, they do appear to be – the actual motivations for – for
    the challenges.
22

23
(Id. at p. 1055.)

24
    During the voir dire proceedings, the following colloquies took place between the court

25
and Ms. M:

26
    Q:  What do you want to tell us [Ms. M.]?

48

A:  I teach a class on Tuesday, Thursday, 5:30 at Consumnes River College and traffic is a problem.  And I need to be there to start my class on time.  [¶]  And if – silly request.  Could we leave at 4:15 everyday and I could probably make my class?  But I have end of the semester another week.  Students waiting for me.

Q:  And it's at Consumnes River?

A:  Consumnes River.

Q:  Okay.  We – we – and your class starts at 5:30?

A:  5:30.

Q:  Well, we end at 4:30.  And I know with traffic it probably takes you about 45 minutes to get there, there'bouts.

A:  It was more than an hour – a hour and hour and 10 minutes the other day.

Q:  Well, you know, we can accommodate you on some days.  And – and I'm not going to promise we can accommodate you everyday.  [¶]  And this is port [sic] of the problem with jury service, and that's not a – it doesn't classify as a hardship.  It's definitely an inconvenience.  And we do understand.  I told you guys at the outset, and I'll say this again.  [¶]  There's been various people to talk to me about issues that they have.  You know, a lot of things are inconvenience but the law does not recognize them as being hardships.  That's the law.  I'm telling you what the law is.  Okay.  So don't quarrel with me with the law.  That's the Legislature.  [¶]  But in any event, I understand it's a major inconvenience.  And truly we know that.  And we do.  Just bear with us.  We may be able to let you out some days, but we're not going to be able to accommodate you every single Tuesday and Thursday, okay?

A:  I hear you . . . .

Q:  All right. [Ms. M.], you are a counselor at Consumnes River College.  [¶]  What do you counsel?

A:  I'm an academic counselor, say students but I'm the academic counselor.

Q:  So you help students who want to go onto college and further their careers or – do you help them, you know, kind of generally stay in school?

A:  The whole gamut.

Q:  The whole gamut?

A:  Everything.

Q:  All right.  So the students are coming to you and, you know, sort of I imagine some of the students come to you a – to sort of hear – sounding board.  Some come to you to sort of, you know, vent.  Some come to you to cry.  Everything, huh?  So you get it all, huh?  [¶]  And are you – are you also called upon to, you know, sort of counsel people through disputes?  [¶]  Let's say, for example, students are having some kind of dispute; have you ever done that?

A:  With the instructor we have to intervene for the kid.

Q:  Do you feel comfortable doing that?

A:  Yeah.

Q:  Okay . . . .

1      A: – one thinking that would be significant that you won't see
there. I worked in a high school in South Central L.A. and I have

2      extensive experience working with gangs and training and still
have training.

3      Q: All right. And what (sic) did you receive the training from?
Was that through the state?

4      A: Through the school district, L.A., USD, crash unit, Omega
Boys Club.

5      Q: Omega Boys Club. That's out of San Francisco actually, Joe
Marshall over there. [¶] Yeah. But any event now, I imagine in

6      south central you were dealing with Surrenos, Crips, Bloods?
A: Just Crips and Bloods.

7      Q: Just Crips and Bloods. [¶] All right. And did you ever have to
counsel gang members?

8      A: Oh, yeah. They were my students.
Q: Okay. And you, know, obviously you've had extensive

9      contacts it sounds like with gang members and you know the
dynamics of gangs. [¶] Now once again, you may actually have

10     witnesses in this case testify about, you know, gangs and gang
involvement and and things of that nature. [¶] Would that present

11     any particular problem for you in light of your background?
A: No.

12

13 (Id. at p. 961-62, 974, 977-78.)

14      The stated reasons for striking Ms. M. were race neutral. Thus, Petitioner has the burden

15 to show that the reasons were pretextual. For the following reasons, Petitioner fails to satisfy that

16 burden with respect to this strike.

17      The prosecutor's concern about Ms. M's background as a counselor who counseled gang

18 members and who represented the students in her position as a counselor in intervening on behalf

19 of the student is supported by the record and is race-neutral. See, e.g., J.E.B. v. Alabama ex rel.

20 T.B., 511 U.S. 127, 142 n. 14 (1994) (suggesting that peremptory challenges based on a status or

21 occupation do not raise the same level of concern as those based on race or gender); Hall v.

22 Leubbers, 341 F.3d 706, 713 (8th Cir. 2003) ("Occupation is a permissible reason to defend

23 against a Batson challenge, and being a social worker could be a legitimate basis to strike a

24 prospective juror."); United States v. Thompson, 827 F.2d 1254, 1260 (9th Cir. 1987)

25 ("[e]xcluding jurors because of their profession . . . is wholly within the prosecutor's

26 prerogative"). Here, the reason for the strike cited by the prosecutor was not only her knowledge

1    of gangs but also due to her position as a counselor to prospective students and gang members.

2    Petitioner fails to establish that this reason was pretextual.

3         Petitioner attempts to use comparative juror analysis to show pretext.  Specifically, he

4    argues that juror number 7 had training with respect to gangs as a teacher and had dealings with

5    gangs.  Juror number 7 testified during the voir dire proceedings that as a soccer coach he

6    occasionally had incidents at practice where he has had to get gang members off of campus.  (See

7    Voir Dire Tr. at p. 838.)  That is far different that Ms. M.'s testimony regarding her counseling of

8    gang members and intervening on behalf of students in situations that arise with instructors.

9    Petitioner's reliance on juror number 7 as a comparative juror to Ms. M. does not show pretext.

10        Petitioner also relies on Snyder in arguing that the prosecutor's rationale concerning Ms.

11   M.'s demeanor and dissatisfaction with the court's response to her request to leave at 4:15 p.m.

12   was pretextual.  Specifically, Petitioner states that:

13              Petitioner has already shown above, with respect to [Irene M.],
                how that rationale [demeanor based] is an unreasonable application
14              of clearly established federal law – it is in direct contravention of
                the Supreme Court's holding in Snyder, 128 S.Ct. 1203.  Thus, the
15              state appellate court upheld the denial of Phan's Batson challenge
                with respect to *two* prospective jurors - [Irene M.] and [Ms. M.] -
16              by making the same mistake twice.  Where, as here, the trial court
                fails to conduct the requisite inquiry and make the requisite
17              findings when the prosecutor proffers demeanor-based
                justifications, the case must be remanded.

18

19   (See Pet'r's Pet. at p. 32.)

20        Petitioner's reliance on Snyder is misplaced under these circumstances with respect to the

21   strike against Ms. M.  First, as the Supreme Court noted in Thaler with respect to the Snyder

22   opinion:

23              The prosecutor in that case [Snyder] asserted that he had exercised
                a peremptory challenge for two reasons, one of which was based on
24              demeanor (i.e., that the juror appeared to be nervous), and the trial
                judge overruled the Batson objection without explanation.  We
25              concluded that the record refuted the explanation that was not
                based on demeanor and, in light of the particular circumstances of
26              the case, we held that the peremptory challenge could not be

                                              51

1    sustained on the demeanor-based ground, which might not have
     figured into the trial judge's unexplained ruling.
2

3    Thaler, 130 S.Ct. at 1174-75.  Unlike Snyder, the non-demeanor based reasons for striking Ms.

4    M. were not refuted by the record as cited above.

5           Finally, it is worth reiterating that Ms. M. is African-American.  The jury was composed

6    of at least one Asian and two African-Americans.  While not dispositive, this is indicative that

7    the strike against Ms. M. was not based on her race.  See Turner, 121 F.3d at 1254.

8           For all of the foregoing reasons, Petitioner fails to satisfy his Batson claim with respect to

9    any of these seven prospective jurors.  Claim I should be denied.

10          B.  Claim II

11          In Claim II, Petitioner argues that he is entitled to federal habeas relief because the trial

12   court "failed to dismiss the jury venire following the prosecutor's use of peremptory challenges

13   against women."  (Pet'r's Pet. at p. 37-38.)  Petitioner argues that he is entitled to habeas relief

14   on Claim II because the trial court applied the wrong standard in determining that Petitioner had

15   failed to satisfy his prima facie case with respect to this Claim.  The California Court of Appeal

16   provided the last reasoned decision on this Claim on direct appeal and stated the following:

17          Defendants contend (in an argument made by Bruce with joinder
            by the others) that reversal is required because the trial court (1)
18          applied the wrong legal standard in determining whether a prima
            facie case of gender discrimination had been shown; and (2)
19          erroneously assumed that a balance of men and women on the jury,
            as finally constituted, defeated the prima facie showing.  We
20          disagree.

21          At the time of defendant's trial, the California standard for a prima
            facie case was whether it was "more likely than not" that the
22          peremptory challenges, if unexplained, were based on
            impermissible group bias.  (People v. Johnson (2003) 30 Cal.4th
23          1402, 1306.)  This standard was subsequently overruled by
            Johnson v. California (2005) 545 U.S. 162 [162 L.Ed.2d 129],
24          which held the appropriate standard is whether sufficient evidence
            is produced to permit the trial judge to draw an inference that
25          discrimination occurred.

26          People v. Bonilla (2007) 41 Cal.4th 313, indicated in a case where

                                          52

the trial preceded the United States Supreme Court
Johnson decision, that where it was unclear whether a trial court
applied the correct "reasonable inference" test rather than the
"strong likelihood" test, the California Supreme Court reviewed
the record independently to apply the high court's standard and
resolve the legal question whether the record supported the
inference that the prosecutor excused a juror on a prohibited
discriminatory basis.  (Bonilla, supra, 41 Cal.4th 313, 342.)  In
Bonilla, the trial court concluded the defendants failed to make out
a prima facie case of discrimination.  (Id. at p. 341.)  Bonilla held
there was no Wheeler/Batson violation in the prosecutor's use of
67 percent of its strikes on women, where the pool consisted of 38
percent women (30 women/48 men) but after deducting men who
were excused for hardship or never called into the box, etc., the
pool the prosecutor had the opportunity to challenge was 47
percent female; the prosecutor used 20 strikes on women (and 10
on men), while the defense used five strikes on women (and 25 on
men); and the final jury was 42 percent women (five out of 12).
(Id. at pp. 345-346 [ultimate jury composition is a factor to be
considered in evaluating a Wheeler/Batson motion].)

Here, reviewing the record independently, we conclude the record
does not support an inference of gender bias.  Defendants fail to
offer any mathematical analysis.  They merely assert the prosecutor
used 12 of 15 challenges against women, including his last seven
challenges.  However, they fail to show what percentage of the
pool were women and fail to refute the observations of the trial
court that the pool was mostly women.

Defendants contend the trial court erred in concluding that a prima
facie showing was defeated by the presence of seven women in the
jury box.  Defendants cite United States v. Bishop (9th Cir. 1992)
959 F.2d 820, which rejected a claim that a "proportionally
representative" jury validated apparent discrimination against
Blacks.  However, as defendants acknowledge, Bishop said a
proportionally representative jury was relevant to the determination
of whether a prima facie case had been made.  As we have noted,
Bonilla, supra, 41 Cal.4th at page 346, said the same thing.  Here,
the trial court considered the balance of the box in determining that
there was no prima facie case.  Thus, defendants have no legal
support for their argument.

We note defendants argue the trial court's comments about the
balance of men and women in the jury box are susceptible of only
two interpretations:  (1) the court did not believe a disproportionate
number of challenges was being used against women (which
defendants claim cannot be reconciled with the fact that the last
seven challenges were to women), or (2) gender bias was
acceptable as long as the ultimate jury composition reflected a
cross-section of the community.  However, it is evident from the
record that the trial court found no prima facie case not because of

1
2
3

the make-up of the jury box but because of the make-up of the jury
pool, which was mostly women.  Defendants cannot show a
disproportionate removal of women because they fail to identify
what proportion of the pool were women (and they failed to
challenge the pool itself as unrepresentative of the community).

4    (Slip Op. at p. 80-82.)

5          The California Court of Appeal applied the correct standard in analyzing Petitioner's

6    argument that the prosecutor was discriminatory in striking female jurors.  As stated above, the

7    California Court of Appeal cited to People v. Bonilla, 41 Cal. 4th 313, 60 Cal. Rptr. 3d 209, 160

8    P.3d 84 (2007) which held as follows:

9
10
11
12
13
14
15
16
17
18

Ordinarily, we review the trial court's denial of a Wheeler/Batson
motion deferentially, considering only whether substantial
evidence supports its conclusions.  (People v. Avila, supra, 38
Cal.4th at p. 541, 43 Cal.Rptr.3d 1, 133 P.3d 1076).  However, the
United States Supreme Court recently concluded that California
courts had been applying too rigorous a standard in deciding
whether defendants had made out a prima facie case of
discrimination.  (See Johnson v. California, supra, 545 U.S. at pp.
166-168, 125 S.Ct. 2410, 162 L.Ed.2d 129 [holding the
requirement a defendant show a "strong likelihood," rather than a
"reasonable inference," of discrimination was inconsistent with
Batson and the federal constitution].)  In cases where the trial court
found no prima facie case had been established, but whether it
applied the correct "reasonable inference" standard is unclear, "we
review the record independently to 'apply the high court's standard
and resolve the *legal* question whether the record supports an
inference that the prosecutor excused a juror' on a prohibited
discriminatory basis."

19    Bonilla, 41 Cal. 4th at 341-42, 60 Cal. Rptr. 3d 209, 160 P.3d 84 (emphasis in original).  The

20    California Court of Appeal used Bonilla which set forth the proper Batson standard.

21          To the extent that Petitioner also argues that the state court's holding was in error, that

22    argument also does not merit federal habeas relief.  In his traverse, Petitioner argues that

23    comparative juror analysis supports his theory that the strikes against Gilda B. and Irene M. were

24    discriminatory.  However, for the reasons discussed in supra Part V.A, comparative juror analysis

25    does not support Petitioner's argument.  Petitioner is not entitled to federal habeas relief with

26

54

1    respect to Claim II.[4]

2        C.  Claim III

3        In Claim III, Petitioner argues that the trial court violated his due process and fair trial

4    rights as well as his right to present a defense when "it excluded two extra-judicial, exculpatory

5    statements of his that were necessary to rebut the prosecution's argument falsely suggesting that

6    he had not professed his innocence prior to his arrest."  (Pet'r's Pet. at p. 39.)  The California

7    Court of Appeal was the last court to issue a reasoned decision on this Claim and stated the

8    following:

9        Bruce contends the trial court violated Evidence Code section 356
          [FN 33] and Bruce's federal right to due process and a fair trial by
10       excluding his exculpatory out-of-court statements to Lamson and
          one Benjamin L., while admitting inculpatory portions of those
11       conversations.  We shall conclude that, even assuming the
          contention was preserved for appeal (a point disputed by the
12       parties), Bruce fails to show reversible error.

13           [FN 33]  Evidence Code section 356
              provides:  "Where part of an act, declaration,
14           conversation, or writing is given in evidence by one
              party, the whole on the same subject may be inquired
15           into by an adverse party; when a letter is read, the
              answer may be given; and when a detached act,
16           declaration, conversation, or writing is given in
              evidence, any other act, declaration, conversation, or
17           writing which is necessary to make it understood
              may also be given in evidence."

18
         1.  The Conversation with Benjamin L.
19
         When the police found residue on Bruce's hand consistent with
20       gunshot residue (GSR) on the night of the shooting, he claimed he
          and his friend "Bubba" (Greg P.) had been shooting guns down at
21       the railroad tracks.  The trial court allowed the prosecution to seek
          to prove this explanation was false by adducing limited evidence of
22

23        ⁴ Petitioner only argues that the strikes against Gilda B. and Irene M. were based on the
24   fact that they are women.  He does not expressly argue that the strikes against Amber D., Wanda
     S. or Ms. M. were based on the fact that they were female.  (See Pet'r's Traverse at p. 13
25   (arguing that comparative juror analysis supports his argument that Gilda B. and Irene M. were
     struck because they are women).)  However, to the extent that Petitioner also argues that the
26   strikes against Amber D., Wanda S. or Ms. M. were based on their sex, his Batson claim would
     fail for the reasons discussed in supra Part IV.A which respect to these three women as well.

conversations to the extent they related to this GSR issue.

During its case-in-chief, the prosecution called Bruce's friend, Benjamin L. as a witness. Benjamin testified he had a conversation with Bruce on October 30, 2002, four days after the shooting at the party, and Bruce said he had been involved in an incident the previous Saturday and also said he had been shooting guns with a mutual acquaintance (Greg P.) by some railroad tracks. Benjamin testified he later asked Greg if it were true, and Greg said no. The trial court admonished the jury the evidence was being offered for a limited purpose, i.e., "whether or not defendant Bruce Phan attempted to fabricate evidence in this case."

Bruce argues on appeal that the prosecution's theory was that Bruce lied to Benjamin out of consciousness of guilt, in an attempt to account innocuously for gun residue the police found on Bruce's hand shortly after the shooting. [FN 34] Bruce argues on appeal that, if the jury agreed with the prosecutor, that would also tend to undermine Bruce's claim of self-defense and defense of others in connection with the shooting at the party.

> [FN 34] This point is perplexing, since Bruce admitted firing a gun at the party. The presumable insinuation is that the gunshot residue evidence forced the admission and gave birth to the fabricated theory of self-defense/defense of others.

On cross-examination, Bruce's lawyer sought to elicit from Benjamin that during his conversation with Bruce on October 30, Bruce said he was involved in a shooting at a party and that he "was shooting back" after he and his friends were fired upon and Lamson was shot. Bruce argues this evidence was consistent with his claim of self-defense of others, and refuted the prosecutor's theory that Bruce was trying to set up a false alibi.

The trial court ruled Bruce could not question Benjamin about his conversation with Bruce to the extent that Bruce said he fired his gun only "to help somebody else." The trial court initially excluded this evidence because it implicated Lamson's rights by suggesting Lamson fired first. [FN 35] The court later ruled that Benjamin's account of the conversation was speculative as to Bruce's motives.

> [FN 35] We do not view as a discrete contention and therefore disregard Bruce's footnote comment about Aranda-Bruton. The People note the trial court was concerned that Lamson not be prejudiced by references to his involvement.

The prosecutor called Greg P. as a witness. Greg P. testified Benjamin came and asked if he had been shooting guns with Bruce, and Greg P. truthfully told him no. At trial, Greg P. denied telling a

police detective that Benjamin asked Greg to lie to help Bruce.

The prosecutor called the police detective (Will Bayles) as a witness. The detective testified he interviewed Greg P., who said Benjamin L. told him that Bruce was in trouble and the police found gunpowder on Bruce's hand. The detective testified Greg said Benjamin asked him (Greg) to lie and say he had been shooting guns at the railroad tracks with Bruce.

Bruce sought to cross-examine the detective about Benjamin's telling the detective that Bruce told Benjamin Lamson got shot. Bruce's lawyer, noting that Lamson indicated he would withdraw any <u>Crawford</u> objection, argued, "the entirety of that statement" was admissible and rebutted the prosecution's insinuation that Bruce asked Benjamin for help, showing a consciousness of guilt. Bruce argued the evidence would support his theory that Benjamin asked Greg P. to lie on Benjamin's own initiative, not at Bruce's request, and Benjamin's reason for doing so was that he felt sorry for Bruce getting caught up in this case when he was only trying to help Lamson.

The trial court said:

"Okay. What I have in my notes regarding Benjamin [L.] is this. Ben [L.] testified here that Bruce Phan never told him about the gunshot residue. [¶] [Benjamin] said Bruce Phan never told him about the shooting at the [party]. [¶] And that Bruce Phan never told him to go to [Greg P.] and attempt to fabricate evidence or provide an alibi on his part. [¶] What the witness [Benjamin] did say . . . was that the witness said on his own he went to – he went to [Greg P.] because he did not feel Bruce was telling the truth about shooting at the railroad tracks . . . . [¶] So in essence, I don't see how allowing the Officer to testify about Bruce Phan told [Benjamin] – would in any way establish the point that [Bruce's lawyer] is seeking to establish. Because in essence he says that Bruce Phan told him he never needed help. [¶] And then furthermore, as it currently stands getting the statement in through Detective Bayles would be two levels – it would require two levels of hearsay. [¶] And unless [Benjamin's] state of mind is related to an element of any of these offense, then his state of mind strictly speaking is irrelevant and it doesn't relate to any of the elements herein. [¶] And furthermore, *under Evidence Code Section 356, I think there is a leap here.* Essentially, what counsel is saying that Bruce Phan had apparently told [Benjamin] that Lamson got shot. Lamson was hurt and Bruce Phan went to his assistance and shot back. [¶] Okay. Now, [Benjamin] disavows any knowledge of that statement. [¶] Moreover, that statement doesn't – without more doesn't give any meaning to what [Benjamin] did in regard to his conversations with Greg [P.] It's simply unrelated. [¶] So on those bas[e]s I'm not going to allow this Officer to testify to what is essentially double hearsay." (Italics added.)

On appeal, Bruce argues the prosecution, by adducing evidence of part of his conversation with Benjamin, opened the door to admission of the entire conversation under Evidence Code section 356, including Bruce's statement to Benjamin that Lamson got shot and that Bruce did not fire first but shot *back* after he and his friends were shot upon, which Bruce feels would have supported his theory of self-defense and defense of others.

However, it is not entirely clear what the testimony would have been, since Benjamin gave different accounts in his statement to the police and his preliminary hearing testimony, and his trial testimony was riddled with equivocation.  Court and counsel entertained the possibility that Benjamin acted on his own when he asked Greg to lie to help Bruce.

Moreover, the portion of the conversation sought to be admitted by Bruce was not necessary to make the conversation understood.  The purpose of Evidence Code section 356 is "to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed.  [Citation.]  Thus, if a party's oral admissions have been introduced in evidence, he may show other portions of the same interview or conversation, even if they are self-serving, which 'have some bearing upon, or connection with, the admission . . .  In evidence.'  [Citations.]"  (People v. Arias (19960 13 Cal.4th 92, 156.)  Evidence Code section 356 allows further inquiry into otherwise inadmissible matter that explains and provides context to other portions of properly admitted evidence.  (People v. Gambos (1970) 5 Cal.App.3d 187, 192.)  The proffered evidence was not necessary to explain the matter of the false GSR explanation.

Moreover, even assuming for the sake of argument that the evidence should have been admitted, Bruce fails to show grounds for reversal.  The standard of review is the Watson standard.  (Arias, supra, 13 Cal.4th at pp. 156-157.)  Benjamin's assertion that Bruce indicated he fired in self-defense or defense of others came for the first time in Benjamin's preliminary hearing testimony.  He did not make the same assertion in his initial statement to police, where he merely said Bruce said he heard gunshots and Lamson got shot.  This is consistent with the prosecution's theory that defendants' group fired first, and one of them accidently shot Lamson.  Additionally, the prosecutor gave early notice that if Benjamin were allowed to testify about Bruce being scared or defending himself, the prosecutor would impeach Benjamin with his videotaped statement to the police that Bruce never said he was scared.

We conclude Bruce fails to show grounds for reversal based on Evidence Code 356.

Bruce argues reversal is required because exclusion of the evidence violated his federal constitutional rights to due process,

confrontation, and a fair opportunity to present a defense.  We disagree.  The cases cited by Bruce are distinguishable.  (E.g., Pennsylvania v. Ritchie (1987) 480 U.S. 39, 56 [94 L.Ed.2d 40] [accused sexual abuser of child had right to have records of child abuse agency turned over to trial court for in-chambers review and release of material information]; Green v. Georgia (1979) 442 U.S. 95 [exclusion of evidence of third party confession]; Chambers v. Mississippi (1973) 410 U.S. 284, 302 [exclusion of evidence from three witnesses that a person other than the defendant had admitted responsibility for the murder, though he later repudiated his confession].)

Assuming for sake of argument the contested evidence should have been admitted, any error was harmless.  "Although the complete exclusion of evidence intended to establish an accused's defense may impair his or her right to due process of law, the exclusion of defense evidence on a minor or subsidiary point does not interfere with that constitutional right.  (People v. Fudge, supra, 7 Cal.4th 1075, 1103.)"  (People v. Cunningham (2001) 25 Cal.4th 926, 999.)

Here, Bruce was not deprived of a meaningful opportunity to present a complete defense.  He was merely foreclosed from presenting fragmentary testimony of a friend whose bias and credibility problems would have made the testimony of questionable value anyway.  Indeed, the trial court stated Bruce could present the evidence he wanted, but he just could not do it through Benjamin L.  Bruce did present his theory of self-defense/defense of others through his own testimony.

We conclude it is not reasonably probable that Bruce would have obtained a better result had the evidence from Benjamin L. been admitted.  (People v. Watson (1956) 46 Cal.2d 818, 836.)

2.  The Conversation with Lamson

During cross-examination of Bruce, the prosecutor played a recording made by police of a conversation between Bruce and Lamson as they sat in the back of a police car on December 1, 2005.  Bruce said to Lamson "game over."  Bruce acknowledged at trial that he did not say anything to Lamson about self-defense during that conversation.  (The court struck Lamson's added comment that he also did not say he shot anyone.)

On redirect examination, Bruce's attorney tried to introduce a police recording of a conversation between Bruce and Lamson later on the day they were arrested.  The trial court described the transcribed conversation in part as follows:

"THE COURT:  . . .
"[Lamson says [t]hat the officers should be in jail for putting innocent civilians in jail.  Self-serving.  There's no exception to the

hearsay rule for that.

"[¶] . . . [¶]

"Lamson [says]; I'm not going to accept blame for anything I didn't do.

"Bruce Phan; I didn't do shit.  They can lock anybody up.

"Lamson; they're trying to come at you with agility, too.

"Bruce replies: I didn't do anything.

"[¶] . . . [¶]

"Lamson goes on to talk about a lot of people got shot at the party, including him.  There are a lot of people there.  There's some way.  There's got to be some way to prove my innocence.  Do you know somebody that was there at the party?  Talks about the number of people there.

"Bruce says my girl – the girl through the party [*sic*].  She knows my girl.  And then they go on talking briefly; get your girl to talk to that girl to help us up.  Tell her to speak the truth.  Demand the truth."  [FN 36]

> [FN 36]  We note the court record contains a police "CONTINUATION REPORT," which says Lamson and Bruce knew they were being recorded because they discovered the digital recorder in a tissue box.  This device malfunctioned, but the videotape was running and captured the conversation.

Bruce argued these statements were necessary to refute the prosecution's misleading cross-examination of Bruce, which suggested that Bruce never professed his innocence on the day of his arrest.  *Lamson* added the statements that were offered for state of mind and were admissible under Evidence Code section 356.  The defense argued these were prior consistent statements.

The trial court said the conversation was "a bunch of self-serving statements given by both defendants" that did not fit the definition of a prior consistent or inconsistent statement.  The court said, "I'm not going to allow it . . . . It doesn't rebut – a lot of the things that they say in the statements are irrelevant.  There's no – really no inconsistencies here.  [¶] . . . [¶]  Most of these pages are just self-serving statements about how the police need to be arrested for arresting us.  They got the wrong person.  We didn't do it.  We're just going there to look for girls or they don't even say that, but they say we're a bunch of ['] pussy hounds ['].  [¶]  And you know – and so there's nothing really that touches on any of the substantive aspects of this case nor is there anything in here that contradicts any of the statements that were made.  These are a bunch [of] self-serving musings between the two defendants.  So I'm going to disallow [them]."

On appeal, Bruce emphasizes the trial court's use of the term "self-serving" and claims this proves error because <u>People v. Arias</u>, <u>supra</u>, 13 Cal.4th 92, said with respect to Evidence Code

1    section 356 that "if a party's oral admissions have been introduced
     in evidence, he may show other portions of the same interview or
2    conversation, *even if they are self-serving*, which 'have some
     bearing upon, or connection with, the admission . . . in
3    evidence.' [Citations.]" (Id. at p. 156, italics added.)

4    However, the mere fact that statements are self-serving does not
     prove error under Evidence Code section 356, because the defense
5    proffered multiple reasons for admitting the evidence.

6    Evidence Code section 356 does not apply because the evidence the
     defense sought to admit was not from the same conversation used
7    by the prosecutor, nor was it necessary in order to make the first
     conversation understood.  The prosecutor used a recording of a
8    conversation made in the police patrol car.  The recording the
     defense wanted to use was of a later conversation which occurred
9    later in the day in the interview room of the sheriff's department
     after Bruce was interviewed by a detective.
10
     Bruce argues that, even if Evidence Code section 356 does not
11   apply, he had a federal constitutional right to present exculpatory
     evidence.  However, the cited cases are distinguishable.  (E.g.,
12   Green v. Georgia, supra, 442 U.S. 95 [exclusion of evidence of third
     party confession]; Chambers v. Mississippi, supra, 410 U.S. 284,
13   302 [exclusion of evidence from three witnesses that a person other
     than the defendant had admitted responsibility for the murder,
14   though he later repudiated his confession].)

15   We conclude Bruce fails to show any evidentiary error respecting
     the trial court's exclusion of this evidence.
16

17   (Slip Op. at p. 99-110.)

18         First, to the extent that Petitioner contends that state court improperly excluded the

19   evidence cited by the California Court of Appeal with respect to Benjamin L. and Petitioner's

20   conversation with Lamson based on state law, he is not entitled to federal habeas relief.  See

21   Estelle v. McGuire, 502 U.S. 62, 68 (1991) (mere errors in the application of state law do not

22   warrant the issuance of a federal writ of habeas corpus).

23         Nevertheless, criminal defendants have a constitutional right to present relevant evidence

24   in their own defense.  See Crane v. Kentucky, 476 U.S. 683, 690 (1986).  This right comes from

25   both the right to due process under the Fourteenth Amendment, see Chambers v. Mississippi, 410

26   U.S. 284, 294 (1973), and the right "to have compulsory process for obtaining witnesses in his

61

1   favor" provided by the Sixth Amendment.  See Washington v. Texas, 388 U.S. 14, 23 (1967).

2   However, "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject

3   to reasonable restrictions," such as evidentiary and procedural rules.  See United States v.

4   Scheffer, 523 U.S. 303, 308 (1998).  "[S]tate and federal rulemakers have broad latitude under the

5   Constitution to establish rules excluding evidence from criminal trials."  Id.  The Supreme Court

6   approves of "well-established rules of evidence [that] permit trial judges to exclude evidence if its

7   probative value is outweighed by certain other factors such as unfair prejudice, confusion of the

8   issues, or potential to mislead the jury."  Holmes v. South Carolina, 547 U.S. 319, 326 (2006).

9   Evidentiary rules do not violate a defendant's constitutional rights unless they "infring[e] upon a

10  weighty interest of the accused and are arbitrary or disproportionate to the purposes they are

11  designed to serve."  Id. at 324 (internal quotation marks and citation omitted); see also Scheffer,

12  523 U.S. at 315 (determining that the exclusion of evidence pursuant to a state evidentiary rule is

13  unconstitutional only where it "significantly undermined fundamental elements of the accused

14  defense").  Generally, it takes "unusually compelling circumstances . . . to outweigh the strong

15  state interest in administration of its trials."  Perry v. Rushen, 713 F.2d 1447, 1452 (9th Cir.

16  1983).  The Supreme Court has expressed its:

17          traditional reluctance to imposed constitutional constraints on
            ordinary evidentiary rulings by state trial courts.  In any given
18          criminal case the trial judge is called upon to make dozens,
            sometimes hundreds of decisions concerning the admissibility of
19          evidence . . . . [T]he Constitution leaves to the judges who must
            make these decisions wide latitude to exclude evidence that is
20          repetitive . . . only marginally relevant or poses an undue risk of
            harassment, prejudice, [or] confusion of the issues.
21

22  Crane, 476 U.S. at 689-90 (internal quotation marks omitted).  With respect to the exclusion of

23  the evidence cited above, a five part balancing test is used to determine if Petitioner's due process

24  rights were violated.  The factors are:  (1) the probative value of the excluded evidence on the

25  central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4)

26  whether it is sole evidence on the issue or merely cumulative; and (5) whether it constitutes a

1   major part of the attempted defense.  See Chia v. Cambra, 360 F.3d 997, 1004 (9th Cir. 2004).

2   Furthermore, even if the exclusion of evidence amounts to constitutional error, the erroneous

3   exclusion of evidence must have had a "substantial and injurious effect" on the verdict in order to

4   justify federal habeas relief."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).  Thus, even if

5   there was constitutional error, Petitioner must show that the error resulted in actual prejudice.

6   See id.

7           As to the state court's ruling with respect to the exclusion of evidence in Ben L.'s

8   testimony, Petitioner argues that it violated his due process rights because it "excluded a portion

9   of a conversation with a friend in which he stated that he had acted in self-defense/defense of

10  others, after the prosecution introduced a different portion of that conversation suggesting, in the

11  prosecution's view, his consciousness of guilt, the prejudice of which error was compounded

12  when the prosecutor suggested to the jury that he had never asserted he had acted in self-defense

13  or defense-of-others."  (Pet'r's Traverse at p. 14).  With respect to the statements made between

14  Petitioner and Lamson, Petitioner argues that "excluding petitioner's statement on the day of his

15  arrest professing his innocence after the prosecution had admitted a different conversation of his

16  on that same day and creating the misleading impression that he had not asserted his innocence

17  that day."  (Id.)  Petitioner fails to show that his due process rights were violated by the state

18  court's exclusion as to Ben L.'s testimony and his statements to Lamson.  First, applying the Chia

19  factors, Ben L.'s testimony was unreliable.  There were inconsistencies between his statements to

20  police, his preliminary hearing testimony and his trial testimony which makes the statement itself

21  unreliable.  Additionally, Petitioner's hearsay statement amounted to a self-serving statement

22  made after the crimes were committed to Ben L. further limited their reliability.  Petitioner's own

23  testimony later in the trial asserted that he acted in self-defense such that the evidence he sought to

24  admit through Ben L. was cumulative.  The central issue of this case was whether Petitioner acted

25  in self-defense, not whether he told people *after the fact* that he acted in self-defense.  Thus, the

26  fact that Petitioner may have said this to Ben L. after the crime was committed was not a "major

1  part" of the attempted defense.  For these reasons, the <u>Chia</u> factors do not weigh in Petitioner's

2  favor.

3          With respect to the statements by Petitioner to Lamson on the day of his arrest, the <u>Chia</u>

4  factors also do not support a finding that the state court decision was an unreasonable application

5  of clearly established federal law.  Petitioner's statements were self-serving and made after the

6  crime was committed.  Furthermore, the statements related to the side issue of whether Petitioner

7  asserted his innocence after the crimes were committed, not to whether he in fact was innocent of

8  the crime because he acted in self-defense.

9          The California Court of Appeal did not unreasonable apply clearly established federal law

10  when it found that <u>Chambers</u>, 410 U.S. 284, <u>Green v. Georgia</u>, 442 U.S. 95 (1979) (per curiam)

11  and <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39 (1987) were distinguishable to Petitioner's case.   In

12  <u>Chambers</u>, an officer was shot by a group of on-lookers and the dying officer (Liberty) shot into

13  the area where the shots appeared to have come from.  410 U.S. at 286.  One of Liberty's shots hit

14  Chambers.  <u>See id.</u>  At trial, an officer testified that he saw Chambers shoot Liberty and another

15  testified that while he could not see whether Chambers had fired the shots, he did see Chambers

16  "break his arm down" shortly before the shots were fired.  <u>See id.</u>  However, as the United States

17  Supreme Court explained:

18          The story of Leon Chambers is intertwined with the story of another
            man, Gable McDonald.  McDonald . . . was in the crowd on the
19          evening of Liberty's death.  Sometime shortly after that day, he left
            his wife in Woodville and moved to Louisiana and found a job at a
20          sugar mill.  In November of that same year, he returned to
            Woodville when his wife informed him that an acquaintance of his,
21          known as Reverend Stokes, wanted to see him . . . . After talking
            with Stokes, McDonald agreed to make a statement to Chambers'
22          attorneys . . . . Two days later, he appeared at the attorneys' offices
            and gave a sworn statement that he shot Officer Liberty.

23

24  <u>Id.</u> at 287.  McDonald also told a friend that he shot Liberty.  <u>See id.</u>  At a preliminary hearing,

25  McDonald repudiated his sworn confession and the justice of the peace released him from

26  custody.  <u>See id.</u> at 288.  One of Chambers' defenses at trial was that McDonald shot Liberty and

1  in that vain:

2           endeavored to show the jury that McDonald had repeatedly
            confessed to the crime.  Chambers attempted to prove that
3           McDonald had admitted responsibility for the murder on four
            separate occasions, once when he gave the sworn statement to
4           Chambers' counsel and three other times prior to that occasion in
            private conversations with friends.

5

6  Id. at 289.  Ultimately, the state courts basically thwarted Chambers' attempts to bring in this

7  evidence relying on certain Mississippi rules of evidence.  See id.  The Supreme Court found that

8  the exclusion of this evidence violated Chambers' due process rights.  It noted that:

9           The hearsay statements involved in this case were originally made
            and subsequently offered at trial under circumstances that provided
10          considerable assurance of their reliability.  First, each of
            McDonald's confessions was made spontaneously to a close
11          acquaintance shortly after the murder had occurred.  Second, each
            one was corroborated by some other evidence in the case –
12          McDonald's sworn confession, the testimony of an eyewitness to
            the shooting, the testimony that McDonald was seen with a gun
13          immediately after the shooting, and proof of his prior ownership of
            a .22-caliber revolver and subsequent purchase of a new weapon.
14          The sheer number of independent confessions provided additional
            corroboration for each.

15

16 Id. at 300.  Continuing the United States Supreme Court explained that:

17          The testimony rejected by the trial court here bore persuasive
            assurances of trustworthiness and thus was well within the basic
18          rationale of the exception for declarations against interest.  That
            testimony also was critical to Chambers' defense.  In these
19          circumstances, where constitutional rights directly affecting the
            ascertainment of guilt are implicated, the hearsay rule may not be
20          applied mechanistically to defeat the ends of justice.

21          We conclude that the exclusion of this critical evidence, coupled
            with the State's refusal to permit Chambers to cross-examine
22          McDonald, denied him a trial with traditional and fundamental
            standards of due process.  In reaching this judgment, we establish
23          no new principles of constitutional law.  Nor does our holding
            signal any diminution in the respect traditionally accorded to the
24          States in the establishment and implementation of their own
            criminal trial rules and procedures.  Rather, we hold quite simply
25          that under the facts and circumstances of this case the rulings of the
            trial court deprived Chambers of a fair trial.

26

1   Id. at 302.  A comparison of the factual circumstances of Chambers compared to Petitioner's case

2   establishes that the two cases are easily distinguishable.  In Chambers, the defendant sought to get

3   into evidence that a third-party confessed to the murder.  This is far different than the self-serving

4   statements that Petitioner made to a witness and a co-defendant after the crime was committed.

5   By way of example only, the evidence in this case was not multiple statements (both sworn and

6   unsworn) from a third-party from which that third-party admitted he committed the crime as it

7   was in Chambers.  The evidence Petitioner sought to admit were purportedly self-serving

8   unreliable statements he made to a witness and to a co-defendant upon his arrest.  Chambers is

9   plainly distinguishable from this case.

10          Petitioner's reliance on Green is also misplaced.  In Green, the petitioner and Moore were

11   indicated for the rape and murder of Allen whereby petitioner and Moore were tried separately

12   and both given death sentences.  See 442 U.S. at 95.  The United States Supreme Court stated the

13   following:

14          The evidence at trial tended to show that [p]etitioner and Moore
            abducted Allen from the store where she was working alone and,
15          acting either in concert or separately, raped and murdered her.  After
            the jury determined that petitioner was guilty of murder, a second
16          trial was held to decide whether capital punishment would be
            imposed.  At this second proceeding, petitioner sought to prove he
17          was not present when Allen was killed and had not participated in
            her death.  He attempted to introduce the testimony of Thomas
18          Pasby, who had testified for the State at Moore's trial.  According to
            Pasby, Moore had confided to him that he had killed Allen, shooting
19          her twice after ordering petitioner to run an errand.  The trial court
            refused to allow introduction of this evidence, ruling that Pasby's
20          testimony constituted hearsay that was inadmissible.

21   Id. at 96 (internal citation omitted).  Ultimately, the Supreme Court held that:

22          Regardless of whether the proffered testimony comes within
            Georgia's hearsay rule, under the facts of this case its exclusion
23          constituted a violation of the Due Process Clause of the Fourteenth
            Amendment.  The excluded testimony was highly relevant to a
24          critical issue in the punishment phase of the trial, and substantial
            reasons existed to assume its reliability.  Moore made this statement
25          spontaneously to a close friend.  The evidence corroborating the
            confession was ample, and indeed sufficient to procure a conviction
26          of Moore and a capital sentence.  The statement was against

66

1

2

3

4

> interest, and there was no reason to believe that Moore had any
> ulterior motive in making it.  Perhaps most important, the State
> considered the testimony sufficiently reliable to use it against
> Moore, and to base a death sentence upon it.  In these unique
> circumstances, "the hearsay rule may not be applied mechanistically
> to defeat the ends of justice."  Chambers v. Mississippi, 410 U.S.
> 284, 302 (1973).

5 Green, 442 U.S. at 97 (internal citations and footnotes omitted).  Similar reasons why Chambers is

6 distinguishable also dictate why Green is distinguishable.  Unlike Green, the statements Petitioner

7 sought to admit in Claim III were his own self-serving statements.  They did not go to the general

8 fact of Petitioner's guilt or innocence, but rather went to whether Petitioner pleaded his innocence

9 after the crime was committed.  Thus, the statements themselves were not against the declarant's

10 interest as was Moore's statement to Pasby in Green.

11       Finally, Petitioner's reliance on Ritchie was also properly distinguished by the California

12 Court of Appeal.  In that case, the Supreme Court directed a trial court to examine confidential

13 files for material of assistance to the defendant in that case.  See Ritchie, 480 U.S. at 61.  The case

14 involved the defendant's daughter alleging that defendant sexually molested her on numerous

15 occasions.  Ritchie is distinguishable from Petitioner's case.  Petitioner sought to admit his own

16 self-serving statements made after the fact to a witness and a co-defendant in which he professed

17 his innocence and/or that he acted in self-defense.

18       Even if Petitioner could show that the trial court erred in failing to admit this evidence, he

19 failed to show that excluding his self-serving hearsay statements made after the crimes were

20 committed had a substantial and injurious effect or influence on the jury's verdict."  See Brecht,

21 507 U.S. at 637.  As previously indicated, the statements related to the side issue of whether

22 Petitioner had professed his innocence after the fact, not to whether Petitioner had actually

23 committed the crime or acted in self-defense.  One statement was made to a witness who had

24 significant credibility problems.  The other was made to a co-defendant after Petitioner was

25 already being held by the police for the crimes.  Furthermore, as the Court of Appeal said, at least

26 with respect to the Ben L. conversation, Petitioner could elicit his statements through his *own*

testimony.  Thus, the Court of Appeal's decision regarding the harmlessness in excluding the Ben L. testimony was not an unreasonable application of clearly established federal law.  See Bains v. Cambra, 204 F.3d 964, 971 n. 2 (9th Cir. 2000) (explaining that the Watson standard "is the equivalent of the Brecht standard under federal law").

Additionally, even assuming arguendo it was in error to exclude Petitioner's statements he made to his co-defendant in the police vehicle, such an error was also harmless.  It related to the side issue of whether Petitioner professed his innocence after the fact, not to any evidence regarding the contemporaneous actions that occurred which gave rise to the charges against Petitioner.  Furthermore, as previously indicated, such statements would obviously be self-serving and lacking in reliability.  Petitioner has failed to show that excluding this evidence had a substantial and injurious effect on the jury's verdict.

For the foregoing reasons, Petitioner is not entitled to federal habeas relief on Claim III.

D.  Claim IV

In Claim IV, Petitioner argues that his federal due process rights and right to a fair trial and impartial jury were violated when the trial court "conducted an intrusive and coercive inquiry during jury deliberations following juror allegations targeting a holdout juror, the lone Asian member of the jury, and then, finding no grounds to dismiss the jury, repeatedly re-instructing the jury in a manner designed to coerce him to end his holdout."  (Pet'r's Pet. at p. 48.)  The last reasoned decision on this Claim was from the California Court of Appeal on direct appeal which stated the following:

> Lamson and Bruce complain the trial court improperly handled the matters of a hold-out juror and a deadlock, which under the totality of the circumstances were coercive.  We disagree.
>
> 1.  Background
>
> Jury deliberations began on Monday afternoon, February 14, 2005. The following week, [FN 28] on Tuesday, February 22, 2005, the jury foreperson sent a note stating:  "We need help.  We have a juror who isn't able to follow the law/unable to apply the facts or the law to the evidence."

68

[FN 28]  The jury deliberated part of the afternoon on the first Monday, all day Tuesday, all day Wednesday, and all day Thursday.  They did not deliberate Friday because a juror was sick.  The following Monday was a holiday.

The trial court noted that inability to follow the law was one of the grounds for dismissal of a juror under section 1089.  [FN 29]  After hearing counsel, the trial court, in reliance on People v. Cleveland (2001) 25 Cal.4th 466, decided to ask the jury foreperson three questions:  (1) Is there a juror who has refused to follow the law; (2) Is the juror listening to or reading the instructions exactly as the court gave them; and (3) Who is the uncooperative juror?  The court said it would then bring all the jurors into the courtroom and ask by a show of hands whether or not there was a juror who was refusing to follow the law.  If the consensus was that such a juror existed, the court intended to question each juror individually, including the challenged juror, outside the presence of others.

[FN 29]  Section 1089 provides in part:  "If at any time, whether before or after the final submission of a case to a jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, . . . the court may order the juror to be discharged and draw the name of an alternate . . . ."

The court questioned the foreperson outside the presence of the other jurors.  The foreperson said the jurors wrote the note together.  The court asked whether there was a juror or jurors unable to follow the law and how many.  The foreperson said yes, one juror.  In response to the court's questions whether that juror had listened to the instructions and was reading the instructions as given, the foreperson said, "I don't believe so" and, "I don't think so."  The court asked which juror, and the foreperson said it was Juror No. 12.  (Juror No. 12 was the sole Asian on the jury.)  The court asked if this juror made up his or her mind before deliberations, and the foreperson said not as far as she knew.  In response to the court's questioning, the foreperson said Juror No. 12 was not refusing to discuss the case and was "listening [to the other jurors].  He doesn't interrupt or anything.  He's listening.  I don't think it's processing."  The foreperson stated her belief that the juror was just not following the law as given by the court.  The court excused the foreperson and told her not to say anything to the other jurors.

The court stated it did not want to rely on the opinion of the foreperson alone and would speak with the other jurors to safeguard defendants' rights.  Bruce objected to the process.  (Lamson later objected the court's questioning was excessive.)

The court called the jury in and reread CALJIC No. 1.00 [FN 30] on

1   juror duties and CALJIC No. 17.40 [FN 31] on jurors' individual
    opinions (over a defense objection that the instruction provided
2   jurors with a vehicle to say that one juror was not following the
    law).  The court refused a defense request to explain to the jury the
3   distinction between following the law and disagreeing.

4       [FN 30]  The court reread from CALJIC No.
        1.00: "You must base your decision on the facts and
5       the law.  [¶]  You have two duties to perform.  First,
        you must determine what facts have been proved
6       from the evidence received in the trial and not from
        any other source.  A 'fact' is something proved by
7       the evidence or by stipulation.  A stipulation is an
        agreement between attorneys regarding the facts.
8       Second, you must apply the law that I state to you, to
        the facts, as you determine them, and in this way
9       arrive at your verdict and any finding you are
        instructed to include in your verdict.  [¶]  You must
10      accept and follow the law as I state it to you,
        regardless of whether you agree with it.  If anything
11      concerning the law said by the attorneys in their
        arguments or at any other time during the trial
12      conflicts with my instructions on the law, you must
        follow my instructions.  [¶]  You must not be
13      influenced by pity for or prejudice against a
        defendant.  You must not be biased against a
14      defendant because he has been arrested for this
        offense, charged with a crime, or brought to trial.
15      None of these circumstances is evidence of guilt and
        you must not infer or assume from any or all of them
16      that a defendant is more likely to be guilty than not
        guilty.  You must not be influenced by sentiment,
17      conjecture, sympathy, passion, prejudice, public
        opinion or public feeling.  Both the People and a
18      defendant have a right to expect that you will
        conscientiously consider and weigh the evidence,
19      apply the law, and reach a just verdict regardless of
        the consequences."
20
        [FN 31]  The court reread CALJIC No. 17.40: "The
21      People and the defendant are entitled to the
        individual opinion of each juror.  [¶]  Each of you
22      must consider the evidence for the purpose of
        reaching a verdict if you can do so.  Each of you
23      must decide the case for yourself, but should do so
        only after discussing the evidence and instructions
24      with the other jurors.  [¶]  Do not hesitate to change
        an opinion if you are convinced it is wrong.
25      However, do not decide any question in a particular
        way because a majority of the jurors, or any of them,
26      favor that decision.  [¶]  Do not decide any issue in

                                70

this case by a flip of the coin, or by any other chance determination."

The court then said to the jurors: "I need to know whether any of you feels that any other juror or jurors are not following the instructions that I just gave to you, that are not following the law, that are not deliberating and then are not considering other opinions. [¶] I need to see by a show of hands. Let me rephrase that. Lower your hands because I saw a quizzical expression on someone's face, and I told you not to say anything. And that juror was following what I just said wasn't anything – anything [*sic*]. [¶] But what I need to know is this. In light of the two instructions that I just reread to you, having those in mind, is there anyone who feels that any other juror or jurors are not following those instructions that I just gave to you, that are not following the law, that are not deliberating and not considering others['] opinions?" All jurors raised a hand except Juror No. 4.

The trial court questioned each juror individually outside the presence of the others, with an admonition not to discuss specifics and not to discuss the inquiry with the other jurors. Juror No. 4 said everyone was doing as the court instructed but he/she was not sure if everybody understood the instructions the same way, and maybe Juror No. 12 did not understand or just saw things a different way. The other jurors mainly agreed Juror No. 12 was participating in deliberations and exchanging ideas, but some said he was not following the instructions and the law. Some thought he was confused. One thought he "refuses to put the evidence and the law together as a reasonable person" and, in response to the court's question whether Juror No. 12 had given the elements of the crime another interpretation or was refusing to follow the law in the instructions, said Juror No. 12 "interprets the law from a . . . [¶] . . . [¶] [g]ang perspective."

The trial court then questioned Juror No. 12, who referred to himself as "following instructions and looking at the evidence and the facts and interpreting the law in a different way." He said he was deliberating with the others, listening to their ideas and exchanging ideas. He said he accepted the instructions on the elements of the crimes. He had no problems with the law. He said, "when I look at the evidence and the facts and preponderance of the evidence and inferences of what it justifies and what it points to, I have to look at that as something real. It's not what I feel. It's not just because I think it should be that way. I have to apply the law to what the evidence shows." He said he had no problem whatsoever, and the law and instructions were "very clear," and "when I look at the facts and the evidence and what it pertains to and what is actually more reasonable, I apply what you instructed me." The court admonished Juror No. 12 not to discuss their conversation with the other jurors. The judge said he did not want the juror to feel as though he were in trouble. The court asked if juror No. 12

71

could retire for further deliberations and put this inquiry out of his mind, to which Juror No. 12 responded yes.

Outside the presence of all jurors, defense counsel agreed with the trial court's assessment that no grounds existed to remove the juror, though Bruce's lawyer said, "I think this whole process has a chilling effect on the individual juror.  And I think without a doubt everybody knows who they're talking about, and he knows that everybody's talking about him.  [¶]  And I'm just [a] little concerned that if you don't discharge him, 'cuz I don't want you to discharge him, what effect that's going to have on further deliberations."  After further discussion, the trial court said, "I think the case law envisions this does have a chilling effect on jurors to some extent.  [¶]  But I also think that when you read the cases, the case are pretty consistent with the manner in which the Court is required to conduct an inquiry.  [¶]  And in this particular case, I think I would have been remiss as a judge if it [sic] hadn't conducted some inquiry to find out.  Because essentially one after the other, you had jurors coming up here saying he didn't follow the law.  He's not following the law.  [¶]  And . . . if you were talking about applicable issues or issues that would affect the defendant's due process and what process is due.  If you refrain from questioning these witnesses [sic], doesn't that deny these defendants a certain process?  [¶]  And like I said, it could hurt the defendant. Maybe it iners [sic] to their benefit[ ].  I don't know.  But we at least have to find out.  [¶]  And the best way to find out is to question them.  And what did we find out when we talked to sort of the golden edge [sic] was Juror Number 12.  Oh, yeah.  I have understand [sic] your law.  I have no qualms with you[r] law.  You heard me ask, can I give you any clarification?  No.  I don't need any clarification.  My interpretation is just different.  [¶[  That's what the systems [sic] envisions.  The systems [sic] envisions, perhaps we might not like it.  But we have one person who can stand up and say you know what, my interpretation is just as reasonable as those other 11 people standing there.  And that's essentially what is – he is saying to us.  You know, that I'm sticking by my guns here."  The court reiterated it felt compelled to make the inquiry because the jurors' note indicated someone was "unable to follow the law," which is a ground for dismissal under section 1089.

The trial court called in the jury and again reread for the jury CALJIC No. 1.00 and No. 17.40 and also reread CALJIC No. 17.41 [FN 32] at the prosecution's request and over defense objection the jury resumed deliberations.

> [FN 32]  CALJIC No. 17.41 said:  "The attitude and conduct of jurors at all times are very important.  It is rarely helpful for a juror at the beginning of deliberations to express an emphatic opinion on the case or to announce a determination to stand for a certain verdict.  When one does that at the outset, a

1
2
3

          sense of pride may be aroused, and one may hesitate
          to change a position even if shown it is wrong.
          Remember that you are not partisans or advocates in
          this matter.  You are impartial judges of the facts."

4
5
6

The next day, Wednesday, February 23, 2005, the jurors sent the court a note reporting their disagreement pursuant to CALJIC No. 8.75, which told the jury, "If you are unable to reach a unanimous verdict as to the charge in Count 1 of first degree murder, do not sign any verdict forms as to that count and report your disagreement to the Court."

7
8
9
10
11

The court calculated the jury had spent about four full days deliberating.  The court indicated it would give the instruction we approved in <u>People v. Moore</u> (2002) 96 Cal.App.4th 1105. Defendants objected and asked that if the court gave the instruction, it should change one thing:  Instead of using <u>Moore</u>'s language that it was the jurors' duty to arrive at a verdict if they could do so "without violence to your individual judgment," the court should say it was their duty to arrive at a verdict if they could do so "without surrendering your individual judgment."

12
13
14

Nevertheless, on the following day, the trial court, after confirming the jury was deadlocked on the first degree murder in count 1, instructed with the language we approved in <u>Moore</u>, <u>supra</u>, 96 Cal.App.4th at pages 1118 through 1120, as follows:

15
16
17
18
19
20
21
22
23
24
25
26

"It has been my experience on more than one occasion that a jury which initially report[ed] it was unable to reach a verdict, was ultimately able to arrive at verdicts on one or more of the counts before it.
"To assist you in your further deliberations, I am going to further instruct you as follows:
"Your goal as jurors should be to reach a fair and impartial verdict, if you are able to do so, based solely on the evidence presented and without regard for the consequences of your verdict regardless of how long it take to do so.
"It is your duty as jurors to carefully consider, weigh and evaluate all of the evidence presented at the trial, to discuss your views regarding the evidence, and to listen to and consider the views of your fellow jurors.
"In the course of your further deliberations, you should not hesitate to reexamine you own views or to request your fellow jurors to reexamine theirs.
"You should not hesitate to change a view you once held if you are convince it is wrong or to suggest other jurors change their views if you are convinced they're wrong.
"Fair and effective jury deliberations require a frank and forthright exchange of views.
"As I previously instructed you, each of you must decide the case for yourself and you should do so only after a full and complete

consideration of all of the evidence with your fellow jurors.
"It is your duty as jurors to deliberate with the goal of arriving at a verdict on the charge if you can do so without violence to your individual judgment.
"Both the People and the defendants are entitled to the individual judgment of each juror.
"As I previously instructed you, you have the absolute discretion to conduct your deliberations in any way you deem appropriate.
"May I suggest that since you have not been able to arrive at a verdict using the methods that you have chosen, that you consider to change [*sic*] the methods you have been following at least temporarily and try new methods.  [¶]  For example, you may wish to consider having different jurors lead the discussions for a period of time or you may wish to experiment with reverse role playing by having those on one side of an issue present and argue the other side's position and vice versa.  This might enable you to better understand the other's position.  [¶]  By suggesting you should consider changes in your methods of deliberations, I want to stress that I am not dictating or instructing you as to how to conduct your deliberations.  [¶]  I merely find you may find it productive to do whatever is necessary to insure each juror has a full and fair opportunity to express his or her views and consider and understand the views of the other jurors.
"I also suggest you reread CALJIC instruction 1.00 on page 1 and CALJIC 17.40 on page 21 and CALJIC instruction 17.41 on page 21.  [¶]  These instructions pertain to your duties as jurors and make recommendations on how you should deliberate.
"The integrity of a trial requires that jurors at all times during their deliberations conduct themselves as required by the instructions.
"CALJIC instruction 1.00 defines the duties of a juror.  [¶]  The decision the jury renders must be based on the facts and the law.  [¶]  You must determine what facts have been proved from the evidence received in the trial and not from any other source.  [¶]  A fact is something proved by the evidence or by a stipulation.  [¶]  Second, you must apply the law I state to you to the facts as you determine them and in this way arrive at your verdict.  [¶]  You must accept and follow the law as I state it to you regardless of whether you agree with the law.  [¶]  If anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law you must follow my instructions.
"CALJIC 17.40 defines the jury's duty to deliberate.  [¶]  The decisions you make in this case must be based on the evidence received in the trial and the instructions given by the Court.  [¶]  These are the matters this instruction requires you to discuss for the purpose of reaching a verdict.
"CALJIC 17.41 is an instruction which recommends how jurors should approach their task.
"You should keep in mind the recommendations this instruction suggests when considering the additional instructions, comments and suggestions I have made in the instructions now presented to

you.

"I hope my comments and suggestions may have [*sic*] some assistance to you.

"You're ordered to continue your deliberations at this time."

After further deliberations, the jury returned their verdicts later that day. As indicated, the jury found all three defendants guilty of second degree murder. The jury also found Lamson guilty of two counts of attempted murder with personal use of a firearm. The jury found Sutter guilty of two counts of attempted murder but found untrue the firearm allegations as to him. The jury found Bruce guilty of attempted murder of V.D. with personal firearm use, but the jury deadlocked as to Bruce on the charge of attempted murder of T.T.

2. Analysis

Defendants do not complain about the trial court's decision not to remove Juror No. 12. Rather, they argue the trial court's conduct, viewed under the totality of the circumstances, was likely to coerce the "hold-out" juror into changing his vote. (Jiminez v. Myers (9th Cir. 1993) 40 F.3d 976, 979.) We shall conclude there is no basis for reversal.

The trial court must investigate reports of juror misconduct to determine whether cause exists to replace an offending juror with an alternate. (Cleveland, supra, 25 Cal.4th at p. 478.)

"[A] trial court's inquiry into possible grounds for discharge of a deliberating juror should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations. The inquiry should focus upon the conduct of the jurors, rather than upon the content of the deliberations. Additionally, the inquiry should cease once the court is satisfied that the juror at issue is participating in deliberations and has not expressed an intention to disregard the court's instructions or otherwise committed misconduct, and that no other proper ground for discharge exists." (Cleveland, supra, 25 Cal.4th at p. 485.)

"A refusal to deliberate [as a ground for removal of a deliberating juror] consists of a juror's unwillingness to engage in the deliberative process; that is, he or she will not participate in discussions with fellow jurors by listening to their views and by expressing his or her own views. Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury. The circumstance that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground for discharge. Similarly, the circumstance that a juror

75

disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts, or the manner in which deliberations should be conducted does not constitute a refusal to deliberate and is not a ground for discharge.  A juror who has participated in deliberations for a reasonable period of time may not be discharged for refusing to deliberate, simply because the juror expresses the belief that further discussion will not alter his or her views.  [Citation.]"  (Cleveland, supra, 25 Cal.4th at p. 485.)

Although the trial court in Cleveland used the procedure of questioning each juror individually, the validity of that procedure was not at issue in the Supreme Court's opinion, the holding of which was that the trial court prejudicially erred in removing the juror because the record did not establish a refusal to deliberate.

We have reviewed the record and conclude the trial court handled the jury's claim of juror misconduct in an appropriate manner.  Although one juror indicated Juror No. 12 was looking at the case from a gang perspective, which suggested Juror No. 12 might favor the defense, the comment came out inadvertently and did not influence the proceedings.  We see nothing in the court's handling of the jury's claim of juror misconduct which was likely to coerce any juror to change his or her vote.  Indeed, we know the jurors felt free to disagree with each other after these proceedings, because the jury eventually deadlocked on one of the attempted murder counts with respect to Bruce, resulting in the court's declaring a mistrial as to that count.

Bruce says the clerk's transcript contains a "not guilty" verdict as to Bruce on the murder count, which appears to have been signed by the foreperson, but which bears the word "void."  Bruce develops no argument from this observation but simply says the assigned error regarding the hold-out juror applies with particular force to him.  We see nothing in the record, and Bruce cites nothing, indicating the voided verdict was anything other than a mistake in filling out the wrong form.

Defendants say the totality of circumstances warranting reversal are:  The jury's deliberations over the course of many days before a problem arose; the court's lengthy and intrusive investigation of the deliberations which effectively and publicly identified the only Asian on the jury as the sole leaning against conviction; the court's repeated rereading of instructions; the court's eventual "dynamite" instruction (which we shall call the Moore instruction) urging the deadlocked jury to reach agreement; and the fact the jury returned verdicts within hours of the Moore instruction.

However, defendants overstate their case.  Although the defense suggests the jury deliberated more than a week before the first problem arose, the jury actually deliberated three days and a fraction of a fourth day – a short time in view of the fact that the trial lasted

76

months.  It was not the court's questioning which identified the "hold-out" juror, because the jurors wrote the note together and presumably knew whom they were talking about.  Although the questioning of the jurors inadvertently revealed to the court and counsel which way the hold-out juror was leaning, the court's restrained handling of the matter was neutral and non-coercive, and the rereadings of instructions were harmless.  Although the verdicts were returned hours after the trial court confirmed the deadlock and read the jury the Moore instruction, the court gave the Moore instruction the day after the jury reported the deadlock.  It is not uncommon for juries to benefit from an overnight respite from each other.

As to the instruction when the jury deadlocked on the degree of murder, defendants acknowledge the trial court instructed the jury with language used by the trial court in a case we affirmed in Moore, supra, 96 Cal.App.4th 1105.  We there observed that People v. Gainer (1977) 19 Cal.3d 835 disapproved of an instruction permitted in federal court (Allen v. United States (1896) 164 U.S. 492, 501-502 [41 L.Ed. 528, 531]) encouraging minority jurors to reexamine their views in light of the majority's views and to consider that the case must be decided at some time.  (Moore, supra, 96 Cal.App.4th at p. 1120.)  In Moore, supra, 96 Cal.App.4th at p. 1121, we concluded the instruction given by the trial court did not constitute an improper Allen charge, and we commended the trial judge (Judge Michael G. Virga) for fashioning an excellent instruction.  In a later case where instructional error led to reversal, People v. Hinton (2004) 121 Cal.App.4th 655 at p. 661, we observed that the error could have ben avoided had the trial court been aware of and used the Moore model.

Defendants argue Moore is not controlling because the question whether instructions coerce a verdict necessarily turns on the facts of the particular case, and Moore is distinguishable because they jury there declared a deadlock after less than a day of deliberations, and the trial court in Moore conducted no inquiry into the jury's deliberations and did not know the division or the majority position, as did the trial court in this case.  None of these circumstances warrants reversal of the case before us.  To the contrary, as noted by the People, the record here shows the jury was not coerced because the jury remained deadlocked on one count of attempted murder as to Bruce, which resulted in a mistrial as to that count.

We conclude defendants fail to show grounds for reversal based on the trial court's handling of the "hold-out" juror and the deadlock.

(Slip Op. at p. 82-98.)

        In Claim IV, Petitioner argues that the trial judge's supplemental charge to the jury was unconstitutionally coercive and violated Petitioner's due process rights.  He also argues that the

1   trial judge's actions were unconstitutional because his actions and communications with the jury

2   resulted in improperly pressuring the juror.

3          The Due Process Clause "clearly requires a fair trial in a fair tribunal, before a judge with

4   no actual bias against the defendant or interest in the outcome of his particular case." Bracy v.

5   Gramley, 520 U.S. 899, 904-05 (1997) (internal quotation marks and citation omitted).  The trial

6   judge must "avoid even the appearance of advocacy or partiality." Duckett v. Godinez, 67 F.3d

7   734, 739 (9th Cir. 1995) (internal quotation marks and citation omitted).  "Coercive statements

8   from the judge to the jury result in a denial of the defendant's right to a fair trial and an impartial

9   jury." Packer v. Hill, 291 F.3d 569, 578 (9th Cir. 2002), rev'd on other grounds, Early v. Packer,

10  537 U.S. 3 (2002).  However, upon learning that the jury is deadlocked, a judge may properly

11  charge the jury to resume deliberations.  See, e.g., Allen v. Untied States, 164 U.S. 492, 501

12  (1896) (approving charge which encouraged the minority jurors to reexamine their views in light

13  of the views expressed by the majority).  The anti-deadlock instruction must be viewed in its

14  context and under all of the circumstances of the case to determine whether it was coercive.  See

15  Jenkins v. United States, 380 U.S. 445, 446 (1965).  Coerciveness is evaluated using the

16  following factors:  (1) the form of the instruction; (2) the period of deliberation following the

17  Allen type charge; (3) the total time of jury deliberations; and (4) the indicia of coerciveness or

18  pressure upon the jury.  See United States v. Foster, 711 F.2d 871, 884 (9th Cir. 1983).

19         Petitioner's first argument centers around the fact that the trial judge purportedly knew that

20  Juror No. 12 was a "hold-out" juror.  (See Pet'r's Pet. at p. 45 ("The state trial court's actions

21  herein were impermissibly coercive.  It knew the numerical breakdown of the jury and knew the

22  identity of the holdout juror when it gave its anti-deadlock charge.").  Thus, through his

23  questioning, the trial judge purportedly impermissibly "polled" the jury according to the

24  Petitioner.  As a basis for concluding that the trial judge was aware that Juror No. 12 was a hold-

25  out juror, Petitioner relies on the statement made by Juror No. 5 during a colloquy with the court

26  that Juror No. 12 was interpreting the law from a "gang perspective."   (See Reporter's Tr. at p.

6759.)  In this case, the trial court's questions to the individual jurors did not involve how they necessarily stood on the issues, but rather were on whether any potential juror was committing misconduct by not following the applicable jury instructions.  Such inquiry was plainly proper under these circumstances in light of the note that the trial judge received from the foreman regarding possible juror misconduct.

Even assuming *arguendo* that the statement by Juror No. 5 about Juror No. 12's "gang perspective" indicated to the trial court that Juror No. 12 was in the minority, Petitioner still would not be entitled to federal habeas relief on this argument.  In the context of federal trials, it has been noted that "if a trial judge inquires into the numerical division of a jury and then gives an Allen charge, the charge is per se coercive and requires reversal."  United States v. Ajiboye, 961 F.2d 892, 893-94 (9th Cir. 1992).  However, such a rule does not implicate constitutional considerations in this federal habeas proceeding as it is based upon the court's supervisory power over proceedings in federal courts, rather than its constitutional power over both federal and state courts.  See Brewer v. Hall, 378 F.3d 952, 956 (9th Cir. 2004).  Thus, this prohibition cannot be considered "clearly established" for purposes of habeas review.  See Early, 537 U.S. at 10 (holding that application of United States v. Gypsum Co., 438 U.S. 422, 462 (1978), in habeas petitions cannot be considered "clearly established" as it did not interpret any provision of the Constitution, but rather, relied upon the supervisory power of the court over federal prosecutions).

Petitioner also argues that the Moore charge given to the jury after the jury wrote to the court that it was deadlocked on the first-degree murder charge violated his constitutional rights.  More specifically, relying on Jiminez v. Myers, 40 F.3d 976 (9th Cir. 1993), Petitioner argues that by giving the Moore instruction, the trial court "'sent a clear message that the jurors in the majority were to hold their position and persuade the single hold-out juror to join in a unanimous verdict, and the hold-out juror was to cooperate in the movement toward unanimity.'" (Pet'r's Pet. at p. 45 (quoting Jiminez, 40 F.3d at 981).  Jiminez has been summarized as follows:

In Jiminez, after almost five hours of deliberation and a jury

79

indication of deadlock, the trial judge inquired as to the number of votes taken and the numerical movement between the first and last votes. The foreperson advised that there had been five or six votes, which had split seven-five, eight-four, nine-three, and nine-two and one. The trial judge then inquired specifically as to the movement which had occurred between the last votes and, after being advised of the specific numerical movement, stated: "Well, that's what's important to me because of the nature of the case. I want to find out that there has been movement." After a three-day weekend and the recommencement of deliberations, the jury again indicated a deadlock. The trial judge, after noting that he previously had asked the jury whether there had been any movement, again asked the jury the number of votes taken and the numerical movement which had occurred. After the foreperson indicated that two votes had been taken and, in response to the judge's follow-up question, advised that the latest vote had been 11-1, the trial judge stated: "So, there has been, then, substantial movement since the last time . . . . Due to the fact we have had that type of movement, I would request, then, to finish the rest of today and see where we are at that point in time." The jury returned a guilty verdict at the close of that day. The court in <u>Jiminez</u> found that, when "viewed against the backdrop of the particular circumstances of the case," the trial judge's comments and conduct amounted to the giving of a coercive "de facto" <u>Allen</u> charge:

> After the first impasse, by eliciting the progression in the voting, determining if it was moving in one direction, expressing his approval of that progression, and telling the jury to continue its deliberations, the trial court effectively instructed the jury to make every effort to reach a unanimous verdict. In view of the disclosure after the second impasse that only one juror remained in the minority and the trial court's implicit approval of the "movement" toward unanimity, the court's instruction to continue deliberating until the end of the day sent a clear message that the jurors in the majority were to hold their position and persuade the single hold-out juror to join in a unanimous verdict, and the hold-out juror was to cooperate in the movement toward unanimity.

The court particularly noted the absence of any counter-balancing instruction that jurors are not to surrender their convictions, concluding that such a supplemental instruction was available under California law.

<u>Pham</u>, 2011 WL 3438440, at *16-17. Unlike <u>Jiminez</u>, in this case there was no repeated court inquiries as to the jury votes taken and the movement of the jurors. Furthermore, the trial judge

1   gave a counter-balancing instruction to the jury through CALJIC 17.40 which explains to the

2   jurors that they are not to decide any question in a particular way because a majority of jurors

3   favors such a decision.

4        More recently, in Parker v. Small, 665 F.3d 1143 (9th Cir. 2011) (per curiam), the Ninth

5   Circuit analyzed whether a trial court's instructions to a jury were coercive.  The Ninth Circuit

6   explained in Parker, 665 F.3d at 1144-45 that:

7            On the third day of deliberations, the jury sent a note to the court
             stating, "We can't come to a decision" The court inquired as to
8            whether the jury had agreed to any of the counts, to which the jury
             responded, "no."  The court returned a note to the jury which read,
9            "Given the complexity and length of this trial – I believe that you
             should continue your deliberations to see if progress can be made in
10           reaching a decision."  Later that day, the jury sent the court another
             note, which read, "Regretfully, we all agree that we will not be able
11           to come to a unanimous decision."  The court responded, "It does
             not appear that you have had time to fully and frankly consider the
12           evidence with open minds and fully and frankly interact with each
             other and try and reach verdicts.  [¶]  This is the process in which
13           you are required by law to engage .  If there is something further
             that the court can do to assist you, please advise me.  Otherwise
14           please continue your deliberations."  Still later the same day, the
             jury requested and received further instructions on the definition of
15           "reasonable doubt."  Then the jury sent another note to the court
             indicating that it was still deadlocked.  The court recessed for the
16           evening and asked the jury to reflect on the case that evening and
             asked the jury to return the following day, but again sent the court a
17           note indicating that it remained deadlocked.  The note explained,
             "We have one juror who says that because he believes all the
18           prosecution witnesses lied, he cannot find the defendant guilty-ever.
             He is unwilling to examine other evidence.  He is wed to the
19           statement the prosecuting attorney made in closing, 'If you believe
             the prosecution witnesses, you must find the defendant guilty.'  He
20           is unable, even though we have asked many times, to explain to us
             how the evidence leads to a not guilty verdict.  We are deadlocked.

21
    The trial court in Parker then instructed the jury using the instruction set forth in Moore.  See id.
22
    at 1145.  The next day, the jury reached a verdict of guilty on the murder charge.  See id. at 1147.
23
         In determining whether the trial judge was unconstitutional coercive in Parker, the Ninth
24
    Circuit explained that:
25
             It is clear from the record that the California that the California
26           Court of Appeal considered the Moore instruction and its potentially

                                         81

coercive effect in context and under all circumstances.  The California Court of Appeal began by finding that the Moore instruction had been previously upheld and endorsed in California. Then the Court considered a line of this Circuit's precedent for determining whether the trial judge's knowledge of a single holdout made the Moore instruction coercive.  After looking at this Circuit's precedent, the instruction given at trial, and the circumstances surrounding the presentation of the instruction, the California Court of Appeal concluded that the supplemental charge did not coerce the jury.

As long as the California Court of Appeal reviewed all the facts, and considered the supplemental charge in its context and under all the circumstances in holding that it was not coercive, then, in the absence of Supreme Court authority to the contrary, this Court must give deference to the California Court of Appeal's judgment.  See Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (noting that the 28 U.S.C. § 2254(d) is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (citations and internal quotations omitted) (per curiam).  We offer no opinion as to whether we would have reached the same result had we been reviewing this case directly.  We hold only that the California Court of Appeal's decision is not contrary to, and does not involve an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.

Parker, 665 F.3d at 1148.  Similar to Parker, the Court of Appeal in Petitioner's case reviewed the facts and considered the context of the supplemental Moore charge in determining that it was not coercive.  Thus, in the absence of United States Supreme Court authority to the contrary, deference will be given to the Court of Appeal's judgment.

Furthermore, the Foster factors previously cited also do not warrant granting federal habeas relief on this Claim.  The supplemental instruction in this case:  (1) informed the jurors that they have absolute discretion to conduct their deliberations in any way they seemed fit; (2) informed the jurors that they should deliberate with a goal of arriving at a verdict if they are able to do so without violence to your individual judgment; (3) phrased the comments from the judge as suggestions and (4) stressed that the judge was not dictating or instructing the jury how to conduct its deliberations.  This instruction did not advise the jurors to acquiesce to the majority decision, but stressed that each juror should carefully weigh the evidence and decide the case for

1   themselves.  The form of the instructions minimized any possible coercive effect.  See, e.g.,

2   Moore v. Adams, Civ. No. 03-1128, 2008 WL 2441084, at *10 (E.D. Cal. June 13, 2008)

3   (explaining that the Moore supplemental instruction to the jury minimized any coercive effect),

4   report and recommendation adopted by, 2008 WL 2915078 (E.D. Cal. July 25, 2008).

5        With respect to the second factor, the trial court gave its supplemental instruction during

6   the morning session on February 24, 2005 and the jury returned with its verdicts during the

7   afternoon session on February 24, 2005.  As noted above, the jury had deliberated for several days

8   prior to the giving of the Moore supplemental instruction.  Under these circumstances, the fact

9   that the jury came back with a verdict apparently several hours after being given the supplemental

10  instruction does not indicate that it was coerced.  See United States v. Bonam, 772 F.2d 1449,

11  1450-51 (9th Cir. 1985) (per curiam) (finding no coercion where there was one day in total of

12  deliberation, 1.5 hours of which came after the Allen charge).

13       With respect to any other indicia of coerciveness, several other circumstances indicate that

14  the jury was not coerced.  First, the jury indicated that it was deadlocked on the first-degree

15  murder charge.  However, it only found Petitioner guilty of second-degree murder, which

16  indicates a lack of coerciveness.  Furthermore, the jury remained hung on one of the attempted

17  murder charges against Petitioner and the trial court declared a mistrial on that count.  This is also

18  further indication of a lack of coerciveness by the trial court's actions.

19       Analyzing the California Court of Appeal's decision in light of the Ninth Circuit's

20  reasoning in Parker, as well as the factors/totality of the circumstances outlined in Foster, leads to

21  a conclusion that Petitioner failed to show that the Court of Appeal's decision denying this Claim

22  was an unreasonable application of clearly established federal law.  Claim IV should be denied.

23       E.  Claim V

24       In Claim V, Petitioner asserts that the trial court violated his Sixth Amendment right to

25  counsel "when it refused to entertain his request to discharge retained counsel and appoint new

26  counsel for purposes of post-trial proceedings."  (Pet'r's Pet. at p. 55.)  The California Court of

1    Appeal provided the last reasoned decision on this Claim and stated the following:

2                On the day set for sentencing, defendants moved for continuances for various reasons.  Bruce's retained counsel said Bruce wanted a
3                new lawyer:

4                "MR. MASUDA [Bruce's lawyer]:  [Bruce] wants independent counsel or – or an attorney appointed to his case.  He wants to – a
5                bring a motion for new trial.  [¶]  He cannot afford another attorney. He basically wants another attorney to look at this case for the
6                purposes of a motion for new trial.
                  "THE COURT:  Based on ineffective assistance of counsel?
7                "MR. MASUDA:  He doesn't say that.  But I would a – infer that that's [sic] the only way he could get that granted.  Either that or –
8                um, or more or less a Marsden [People v. Marsden (1970) 2 Cal.3d 118] Motion at this time.
9                "THE COURT:  Well, you're retained on this case, correct?
                  "MR. MASUDA:  That's correct.
10             "THE COURT:  All right.  So, um, we don't do Marsden Motions on retained cases.
11             "MR. MASUDA:  Yeah."

12             On appeal, Bruce argues the trial court erred because People v. Munoz (2006) 128 Cal.App.4th 860 requires a trial court to
13             entertain a defendant's motion to discharge retained counsel, and the standard is less stringent than Marsden and does not require the
14             defendant to show ineffective assistance of counsel.

15             However, it was defense counsel, not the judge, who characterized Bruce's request as a Marsden motion.  In any event, under the
16             circumstances of this case, Bruce fails to show reversible error.

17             Thus, in Munoz, supra, 138 Cal.App.4th 860, a defendant moved to discharge retained counsel and obtain appointed counsel after the
18             defendant was convicted in a jury trial and before sentencing.  The defendant wrote to the judge 40 days after being convicted and nine
19             days before the scheduled sentencing, alleging his retained lawyer did not adequately investigate his case and did not communicate
20             with him.  (Id. at p. 864.)  When the trial court addressed the request in court, the court stated that substitution of counsel after a verdict
21             requires a conflict of interest or incompetent representation.  (Ibid.) Retained counsel said he had significant health problems that
22             affected his ability to represent his client.  (Ibid.)  After trailing the matter to allow the defendant to submit a letter specifying instances
23             of incompetence by counsel, the trial court denied the request on the ground that the defendant had failed to make an adequate showing
24             that retained counsel was incompetent.  (Id. at p. 865.)  Munoz reversed and remanded to allow the defendant to discharge his
25             lawyer.  (Id. at p. 871.)

26             Munoz cited People v. Ortiz (1990) 51 Cal.3d 975 (Ortiz), where

the California Supreme Court held a criminal defendant has the right to relieve his retained attorney and have new counsel appointed and further has the right to do so without demonstrating (as would be required in Marsden motions) that the retained attorney is incompetent.  (Munoz, supra, 138 Cal.App.4th at pp. 863, 866.)  Ortiz said it was ordinarily appropriate to require a showing of incompetence for substitution of appointed counsel, because the defendant is requesting duplicative efforts at taxpayers' expense, but that was not the case where the defendant was requesting appointed counsel for the first time.  (Munoz, supra, 138 Cal.App.4th at p. 868, citing Ortiz, supra, 51 Cal.3d at p. 986.)  However, as noted by Munoz, Ortiz also said the defendant's right to discharge retained counsel is not absolute; the trial court, in its discretion, may deny the motion if the discharge would result in significant prejudice to the defendant, or if it was not timely, i.e., if it would result in disruption of the orderly processes of justice.  (Munoz, supra, 138 Cal.App.4th at p. 866.)  Ortiz held the erroneous denial of the defendant's right to relieve retained counsel mandated automatic reversal, where the defendant's motion was made after a mistrial was declared in his first trial and well before any second trial and therefore would not have interfered with the orderly processes of justice.  (Ortiz, supra, 51 Cal.3d at p. 987; Munoz, supra, 138 Cal.App.4th at p. 866.)

The issue in Munoz was whether Ortiz applied when the defendant sought to relieve his retained attorney and have new counsel appointed *after* the defendant had been convicted.  (Munoz, supra, 138 Cal.App.4th at p. 863.)  Munoz concluded Ortiz did apply, because counsel's assistance is considered essential at every critical stage of the criminal process, including postconviction proceedings such as motions for new trial and sentencing.  (Id. at p. 867.)  Munoz concluded a trial court faced with a request to substitute retained counsel must balance the defendant's interest in new counsel against the disruption, if any, flowing from the substitution.  (Id. at p. 870.)  Blanket generalizations about possible delay would not suffice.  (Ibid.)  In the case before the Munoz court, the trial court had failed to exercise its discretion, and the record indicated the defendant's request was generated by a genuine concern about the adequacy of the defense rather than an attempt to delay the proceedings, and substitution of counsel would not necessitate a lengthy delay because the trial lasted only two days.  (Ibid.)  Accordingly, Munoz reversed and remanded to allow the defendant to discharge retained counsel, though the appellate court observed its decision did not require an automatic retrial.  The case would proceed anew from the point the defendant originally sought to discharge his lawyer.  (Id. at p. 871.)

Here, it appears to us that any error by the trial court was invited by defense counsel's assumption that the topic was a Marsden motion.  Bruce does not claim ineffective assistance of counsel in his lawyer's handling of this matter.  In any event, even assuming trial

court error, we do not believe reversal is required.  Although a trial court's failure to exercise discretion generally leads to a reversal to allow the court to exercise its discretion, it is clear the trial court would have denied the motion to discharge retained counsel.

Thus, after denying Bruce's request to change lawyers, the trial court addressed his codefendants' motions for new trial, during the course of which the court referred to a letter from Bruce about an issue he wanted time to investigate.  The prosecutor argued there were no grounds for a continuance.  When asked by the court if he had any comment, Bruce's lawyer said Bruce "has continuously asked of me to look into the issues of a motion for new trial, and I believe I have.  And I have indicated to him in the past that if there was some good grounds, I would bring a motion for new trial. [¶] So I think it's a mischaracterization on the part of [the prosecutor] to say that [Bruce] is just now bringing this issue up.  This issue has been brought up between [Bruce] and myself quite some time ago.  It's just that we disagree." The trial court denied Bruce's request for a continuance as untimely.  The court explained its reasons for denying Lamson's request for a continuance and returned to the matter of Bruce, stating, "as to Bruce Phan, I think there was more than adequate time to address that issue (which Bruce sought to investigate] with the Court [and] perhaps you thought your attorney was deficient in some manner.  [¶] And I'm not prepared to get into that . . . [¶] . . . [but] as far as I'm concerned, you received more than adequate representation from Mr. Masuda.  [¶] And in any event, the motion's untimely.  This is something that should have been brought to the Court's attention very early-on.  [¶] Even if you were in discussions with Mr. Masuda, if the substance of your dispute involved his – his representation, you could have petitioned the Court at an early date to see if you had a motion for new trial and we could have dealt with the issue at that point, um, a motion for new trial based on ineffective assistance of counsel, but that doesn't – wasn't done.  [¶] And now you want to do it on the date that was set for judgment and sentence.  We have a courtroom full of folks who wish to be heard in this [sentencing] proceeding.  And, um, you know, I'm . . . gonna take it on faith and trust as if [sic] there were any issues that he needed to flush out on your behalf he would have done so.  [¶] So in any event, . . . the motion to continue for Bruce Phan is . . . denied."

Thus, although the trial court was speaking with reference to the motion for a continuance rather than the request to discharge counsel, it is clear that the trial court, had it entertained the request to discharge counsel, would have denied it as untimely.  It is hard to imagine a case where discharge of retained counsel would lead to more disruption of the orderly processes of justice.  To bring in a new lawyer and ask him or her to review a trial transcript of more than 6,800 pages, plus hundreds of pages of court filings, would obviously require a significant delay – much longer than the three-

week continuance granted to Sutter.  We therefore reject Bruce's unpersuasive argument that the trial court was *required* to grant his motion to change lawyers because the court granted Sutter's motion for a continuance.  Moreover, Bruce's request to change lawyers was not made until the day scheduled for sentencing, despite the fact that after the verdicts were returned the defendants waived time and the sentencing hearing was set for approximately eight weeks after the verdicts were returned.  Bruce cites no evidence in the record supporting his claim that he had no prior opportunity to make his motion to change lawyers.  Moreover, in finding itself forced to continue Sutter's sentencing due to a delay in the probation report, [FN 37]  the trial court noted there were about 30 people in the audience expecting a sentencing hearing.  Sutter's lawyer stipulated the court could begin the sentencing process by hearing the victim impact statements that day despite the continuance.  Obviously, if Bruce were allowed to change lawyers, that procedure would also have been disrupted.

> [FN 37]  The parties say the court continued Sutter's sentencing due to his new trial motion.  However, our reading of the record is the trial court's "chief concern" was with the delay in receiving the probation report, though the court also continued the hearing on the motion for new trial.

At oral argument in this court, Bruce cited People v. Braxton (2004) 34 Cal.4th 798, which found reversible error in a trial court's refusal to hear a defendant's motion for new trial before pronouncing judgment.  Here, however, there was no motion for new trial but rather a motion to discharge counsel and get a new lawyer to look into the possibility of pursuing a motion for new trial.

We conclude Bruce fails to show grounds for reversal based on the denial of his request to discharge retained counsel obtain appointed counsel.

(Slip Op. at p. 110-17.)

        The denial of a motion to substitute counsel can implicate a criminal defendant's Sixth Amendment right to counsel and thus is properly considered in federal habeas corpus.  See Bland v. California Dep't of Corr., 20 F.3d 1469, 1475 (9th Cir. 1994), overruled on other grounds by, Schell v. Witek, 218 F.3d 1017 (9th Cir. 2000) (en banc).  The relevant inquiry is whether the petitioner's Sixth Amendment right to counsel was violated.  See Schell, 218 F.3d at 1026.  "'The Sixth Amendment's right to counsel encompasses two distinct rights: a right to adequate representation and a right to choose one's own counsel.  The adequate-representation right applies

to all defendants and 'focuses on the adversarial process, not on the accused's relationship with his lawyer as such.'"" United States v. Rivera-Corona, 618 F.3d 976, 979 (9th Cir. 2010) (quoting Daniels v. Lafler, 501 F.3d 735, 738 (6th Cir. 2007) (quoting United States v. Cronic, 466 U.S. 648, 657 n. 21 (1984))).  A defendant who can hire his own attorney has a right "to be represented by the attorney of his choice."  Id. (citing United States v. Gonzalez-Lopez, 548 U.S. 140, 147-48 (2006).  However:

> The right to retained counsel of one's choice is not absolute: A defendant may not "insist on representation by a person who is not a member of the bar, or demand that a court honor his waiver of conflict-free representation," and the Supreme Court has "recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness . . . and against the demands of its calendar."  Gonzalez-Lopez, 548 U.S. at 152 (citing Wheat v. United States, 486 U.S. 153, 159-60 (1988)).  In general, a defendant who can afford to hire counsel may have the counsel of his choice unless a contrary result is compelled by "purposes inherent in the fair, efficient and orderly administration of justice."  United States v. Ensign, 491 F.3d 1109, 1115 (9th Cir. 2007).

Id.  Furthermore, "broad discretion must be granted trial courts on matters of continuances; only an unreasonable and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel."  Morris v. Slappy, 461 U.S. 1, 11 (1983).

The California Court of Appeal determined that had the trial court considered Petitioner's motion to replace counsel, it would have been denied as untimely.  This was not an unreasonable application of clearly established federal law.  Petitioner's request was made the morning he was to be sentenced.   This occurred two months after Petitioner was convicted by a jury.  It was within the trial court's discretion to deny the motion made at sentencing where substitution would require a continuance.  Cf. Bland, 20 F.3d at 1476; Katekeo v. Felker, Civ. No. 08-2776, 2009 WL 805806, at *7 (E.D. Cal. Mar. 26, 2009) ("[T]he court observes that petitioner's motion for substitute counsel was made at the sentencing hearing.  The time of the motion suggests that it may have been more motivated by disappointment with the verdict than actual dissatisfaction with counsel."); report and recommendation adopted by, 2009 WL 1456537 (E.D. Cal. May 22, 2009),

1    aff'd by, 401 Fed. Appx. 246 (9th Cir. Oct. 27, 2010).  In Gonzalez-Lopez, the United States

2    Supreme Court stated that the a trial court has wide latitude in balancing the right to counsel of

3    choice against the needs of fairness and against the demands of its calendar.  See 548 U.S. at 152.

4    Here, the Court of Appeal analyzed the significant disruption that the motion would have caused

5    as it:  (1) would require significant delay due to new counsel being required to review over 6,800

6    pages of trial transcript; and (2) would require that thirty victim impact statements be taken at a

7    different time despite the witnesses already being present at Petitioner's sentencing hearing when

8    he made his motion.  Applying the requisite AEDPA deference, and in light of the Supreme

9    Court's holding that a state court has wide latitude in analyzing such a motion, Petitioner has

10   failed to show that the California Court of Appeal's decision was an unreasonable application of

11   clearly established federal law.

12           Petitioner relies on Gonzalez-Lopez, 548 U.S. 140 to support his argument that the trial

13   court's decision per se entitles him to federal habeas relief because it failed to conduct an inquiry

14   into Petitioner's issues with trial counsel.  Petitioner's reliance on Gonzalez-Lopez is misplaced.

15   As one court has explained in distinguishing Gonzalez-Lopez:

16                Nor does the Supreme Court's recent decision in United States v.
                 Gonzalez-Lopez, 548 U.S. 140, 126 S.Ct. 2557, 165 L.Ed.2d 409
17               (2006), assist Petitioner.  In Gonzalez-Lopez, the Supreme Court's
                 ruling was explicitly predicated on the government's concession
18               that the trial court's ruling was erroneous and was, therefore,
                 limited to the issue whether the error should be reviewed under a
19               harmless error analysis or whether it was a structural error requiring
                 per se reversal.  126 S.Ct. at 2565-66.  The Supreme Court stated
20               that "the right at stake here is the right to counsel of choice, not the
                 right to a fair trial; and that right was violated because the
21               deprivation of counsel was erroneous."  Id. at 2562 (emphasis
                 added).  Furthermore, the Supreme Court specifically noted that
22               "[n]othing we have said today casts any doubt or places any
                 qualification upon our previous holdings that limit the right to
23               counsel of choice . . . We have recognized a trial court's wide
                 latitude in balancing the right to counsel of choice against the needs
24               of fairness, and against the demands of its calendar."  Id. at 2565
                 (citing Wheat, 486 U.S. at 163-64, and Morris, 461 U.S. at 11-12.
25               Finally, the Supreme Court expressly recognized that "[t]his is not a
                 case about a court's power . . . to make scheduling and other
26               decisions that effectively exclude a defendant's first choice of

                                              89

1    counsel." Id. at 2566.

2  Lennon v. Shepherd, Civ. No. 06-5237, 2008 WL 1777827, at *7 (C.D. Cal. Mar. 20, 2008).  The

3  state court's determination that Petitioner's request was untimely cannot be construed as an

4  unreasoning and arbitrary insistence upon expeditiousness in the face of justifiable delay in this

5  case.  See, e.g., Miller v. Blacketter, 525 F.3d 890, 898 (9th Cir. 2008).

6         For the foregoing reasons, Claim V should be denied.[5]

7              VI.  PETITIONER'S REQUEST FOR AN EVIDENTIARY HEARING

8         Petitioner requests an evidentiary hearing on his Claims.  A court presented with a request

9  for an evidentiary hearing must first determine whether a factual basis exists in the record to

10  support petitioner's claims, and if not, whether an evidentiary hearing "might be appropriate."

11  Baja v. Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999); see also Earp v. Ornoski, 431 F.3d 1158,

12  1166 (9th Cir. 2005).  A petitioner requesting an evidentiary hearing must also demonstrate that

13  he has presented a "colorable claim for relief."  Earp, 431 F.3d at 1167 (citations omitted).  To

14  _____

15       [5] The apparent issue between Petitioner and his retained counsel was a disagreement as to
     the merits of a new trial motion.  Petitioner's trial counsel stated the following:

16
             [Petitioner] has asked of me to look into the issues of a motion for
17           new trial, and I believe I have.  And I have indicated to him in the
             past that if there was some good grounds, I would bring them . . .
18           This issue has been brought up between [Petitioner] and myself
             quite some time ago.  It's just that we disagree.  [¶] And so at this
19           pont in time his request is – because of this disagreement he wants
             an appointed attorney so to review – these issues.

20  (Reporter's Tr. at p. 6883-84.)

21       The above statement by Petitioner's trial counsel indicates that the issue between himself
22  and Petitioner was a disagreement as to the merits of his issues.  Petitioner does not assert that
    this led to a lack of communication nor does Petitioner indicate in his federal habeas petition that
23  the issue between himself and his trial counsel was anything beyond a disagreement over the
    merits of a motion for a new trial.  See, e.g., Stenson v. Lambert, 504 F.3d 873, 886 (9th Cir.
24  2007) ("Disagreements over strategic or tactical decisions do not rise to level of a complete
    breakdown in communication.").  In his petition, Petitioner argues that trial counsel forfeited the
25  opportunity to allow the trial court to reconsider Petitioner's Batson challenges during the post-
    trial proceedings.  However, as stated in supra Parts IV.A & B, Petitioner's Batson issues were
26  without merit and properly denied.

                                          90

1  show that a claim is "colorable," a petitioner is "required to allege specific facts which, if true,

2  would entitle him to relief." Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir. 1998) (internal

3  quotation marks and citation omitted).  In this case, an evidentiary hearing is not warranted for the

4  reasons stated in supra Part V.  Petitioner failed to demonstrate that he has a colorable claim for

5  federal habeas relief.  Moreover, the Supreme Court has recently held that federal habeas review

6  under 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that

7  adjudicated the claim on the merits" and "that evidence introduced in federal court has no bearing

8  on" such review.  Cullen v. Pinholster, 131 S.Ct. 1388, 1398, 1400 (2011).  Thus, his request will

9  be denied.

## VII.  CONCLUSION

10

11  Accordingly, IT IS HEREBY ORDERED that:

12  1.  The August 25, 2011 Order, Findings and Recommendations is VACATED;

13  2.  Respondent's request for relief from default is DENIED AS MOOT and his request

14      to file his answer late is GRANTED.  Respondent's answer is deemed timely filed;

15      and

16  3.  Petitioner's request for an evidentiary hearing is DENIED.

17  For all of the foregoing reasons, IT IS RECOMMENDED that the petition for writ of

18  habeas corpus be DENIED.

19  These findings and recommendations are submitted to the United States District Judge

20  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

21  after being served with these findings and recommendations, any party may file written objections

22  with the court and serve a copy on all parties.  Such a document should be captioned "Objections

23  to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be

24  served and filed within seven days after service of the objections.  The parties are advised that

25  failure to file objections within the specified time may waive the right to appeal the District

26  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  In any objections he elects to file,

1  Petitioner may address whether a certificate of appealability should issue in the event he elects to

2  file an appeal from the judgment in this case.  See Rule 11, Federal Rules Governing Section 2254

3  Cases (the district court must issue or deny a certificate of appealability when it enters a final

4  order adverse to the applicant).

5  DATED:  February 29, 2012

6

7

8                                            TIMOTHY J BOMMER
                                             UNITED STATES MAGISTRATE JUDGE
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26